# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Civil Action No. 5:12-cv-06744-MSG

CONESTOGA WOOD SPECIALITIES CORPORATION, a PA Corporation;
NORMAN HAHN;
NORMAN LEMAR HAHN; and
ANTHONY H. HAHN

      Plaintiffs,

v.

KATHLEEN SEBELIUS, in her official capacity as
Secretary of the United States Department of Health and Human Services;
HILDA SOLIS, in her official capacity as
Secretary of the United States Department of Labor;
TIMOTHY GEITHNER, in his official capacity as
Secretary of the United States Department of the Treasury;
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
UNITED STATES DEPARTMENT OF LABOR; and
UNITED STATES DEPARTMENT OF THE TREASURY;

      Defendants.

---

# BRIEF IN SUPPORT OF
# MOTION FOR PRELIMINARY INJUNCTION

---

i

# TABLE OF CONTENTS

Table of Authorities.................................................................................................iii

Introduction .............................................................................................................. 1

Factual Background.................................................................................................. 3

Argument.................................................................................................................. 7

    I.      Plaintiffs Are Likely to Succeed on the Merits. ......................................... 7

          A. The Mandate violates RFRA................................................................. 7

              1.  The Mandate substantially burdens Conestoga's exercise of religion. ................................................................................................ 8

              2.  Other means would be less restrictive of Conestoga's religious exercise. ...................................................................................... 15

              3.  The Mandate is not justified by a compelling interest. ................. 17

          B. The Mandate violates Plaintiffs' right to Free Exercise of Religion. . 25

              1.  The Mandate is not generally applicable because it disfavors religion.................................................................................... 25

              2.  The Mandate is not neutral towards religion................................ 28

              3.  The Mandate fails strict scrutiny. .................................................. 30

          C. The Mandate violates the Establishment Clause.................................. 31

          D. The Mandate violates Conestoga's Freedom of Speech. .................... 33

    II.    Plainitffs Will Suffer Irreparable Harm Absent an Injunction. ................... 34

III.   An Injunction Will Cause No Harm to Defendants. ....................................35

IV.   The Public Interest Favors a Preliminary Injunction. .................................36

Conclusion ............................................................................................................37

Certificate of Service ............................................................................................39

## TABLE OF AUTHORITIES

*Cases*

*Am. Civil Liberties Union v. Ashcroft,*
     322 F.3d 240 (3d Cir. 2003).............................................................36

*Am. Civil Liberties Union v. Reno,*
     929 F. Supp. 824 (E.D. Pa. 1996) ....................................................35

*AT & T v. Winback v. Conserve Program,*
     42 F. 3d 1421 (3d Cir. 1994) ...........................................................36

*Blackhawk v. Pennsylvania,*
     381 F.3d 202 (3d Cir. 2004)........................................................2, 23, 26-27

*Braunfeld v. Brown,*
     366 U.S. 599 (1961) ........................................................................29

*Brown v. Entm't Merchs. Ass'n,*
     131 S. Ct. 2729 (June 27, 2011)..................................................18-20

*Cal. Democratic Party v. Jones,*
     530 U.S. 567 (2000) ........................................................................17

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
     508 U.S. 520 (1993) ..................................................................*passim*

*Citizens United v. Federal Election Comm'n,*
    130 S. Ct. 876 (2010) ................................................................................ 11

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) .............................................................................. .....17

*Colo. Christian U. v. Weaver,*
    534 F.3d 1245 (10th Cir. 2008) ............................................................ 3, 31

*EEOC v. Townley Eng'g & Mfg. Co.,*
    859 F.2d 610 (1988) ................................................................................ 11

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................................ 34

*Employment Division v. Smith,*
    494 U.S. 872 (1990) .................................................................................. 8

*Fraternal Order of Police v. City of Newark,*
    170 F.3d 359 (3d Cir. 1999) .................................................................. 8, 27

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) .........................................................................*passim*

*Gov't of Virgin Is., Dep't Conservation and Cultural Affairs v. Virgin Is. Paving,*
    714 F. 2d 283 (3d Cir. 1983) ...................................................................35

*Hobby Lobby Stores, Inc. v. Sebelius,*
    ____ F. Supp. 2d _____ 2012 WL 5844972
    (W. D. Okla. Nov. 19, 2012) ................................................................... 12

*Hodgkins v. Peterson,*
    355 F.3d 1048 (7th Cir. 2004) ................................................................ 16

*Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Group of Boston,*
    515 U.S. 557 (1995) ................................................................................ 33

*Jolly v. Coughlin,*
    76 F.3d 468 (2d Cir 1996) ....................................................................... 34

*Kikumura v. Hurley,*
    242 F.3d 950 (10th Cir. 2001)........................................................................34

*Kos Pharm., Inc. v. Andrx Corp.,*
    369 F.3d 700 (3d Cir. 2004) ....................................................................7, 36

*Larson v. Valente,*
    456 U.S. 228 (1982) ......................................................................................31

*Legatus v. Sebelius,*
    _____ F.Supp.2d ___, 2012 WL 5359630 (E.D. Mich. Oct 31, 2012) ...........1

*Monell v. Dept. of Social Services,*
    436 U.S. 658 (1978) ......................................................................................11

*Newland v. Sebelius,*
    _____ F.Supp.2d ___, 2012 WL 3069154
    (D. Colo. July 27, 2012) ........................................................1, 11, 13, 17, 25

*N.J. Retail Merchants Ass'n v. Sidamon-Eristoff,*
    669 F.3d 374 (2012) ......................................................................................36

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,*
    389 F.3d 973, 995 (10th Cir. 2004) ..............................................................34

*O'Brien v. United States Dep't of Health and Human Services.,*
    No: 12-3357 (8th Cir. Nov. 28, 2012) ......................................................1, 11

*O'Brien v. United States Dep't of Health and Human Services,*
    ___ F. Supp. 2d ____, 2012, WL 441208, at (E.D. Mo. 2012) .....................12

*Oklahoma v. Sebelius,*
    No. 11-cv-00030 (E.D. Okla. Filed Sept. 19, 2012) ..............................12, 22

*Opticians Ass'n of Am. v. Indep. Opticians of Am.,*
    920 F. 2d 187 (3d Cir. 1990) ........................................................................36

*Powelton Civic Home Owners Ass'n v. Dep't of Housing and Urban Development*
    284 F. Supp. 809 (E.D. Pa. 1968) .................................................................38

*Ramsey v. City of Pittsburgh,*
    764 F. Supp. 2d 728 (W.D. PA 2011) ............................................................ 36

*Riley v. National Federation of the Blind of North Carolina, Inc.,*
    487 U.S. 781 (1988) ............................................................................... 16-17

*RoDa Drilling Co. v. Siegal,*
    552 F.3d 1203 (10th Cir. 2009)...................................................................... 38

*Sherbert v. Verner,*
    374 U.S. 398 (1963) ................................................................................ 8-10

*Shrink Missouri Government PAC v. Adams,*
    151 F.3d 763 (8th Cir. 1998) ....................................................................... 12

*Stormans, Inc. v. Selecky,*
    586 F.3d 1109 (9th Cir. 2009).................................................................. 11, 34

*Thomas v. Review Board,*
    450 U.S. 707 (1981) ...................................................................................... 7

*Thomas v. Collins,*
    323 U.S. 516, 530 (1945) .................................................................. 11, 14, 17

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 624 (1994) .................................................................................... 33

*Tyndale House Publishers, Inc. v. Sebelius,*
    ___ F.Supp.2d___, 2012 WL 5817323 (D.D.C. Nov. 16, 2012) ..2, 11, 14, 25

*United States v. Lee,*
    455 U.S. 252 (1982) .................................................................................... 13

*Washington v. Klem,*
    497 F.3d 272 (3d Cir. 2007) .......................................................................... 9

*Wilson v. NLRB,*
    920 F.2d 1282 (6th Cir. 1990)....................................................................... 31

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) .................................................................................8-10

*Wooley v. Maynard*,
    430 U.S. 705 (1977) .................................................................................33-34

*W.V. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) .................................................................................... 33


**Statutes**

1 U.S.C. § 1 ................................................................................................... 11

26 U.S.C. § 4980D ................................................................................. 6, 10, 34

26 U.S.C. § 4980H ................................................................................. 6, 10, 34

26 U.S.C. §§ 5000A(d)(2)(a) ........................................................................... 22

29 U.S.C. § 1132 .................................................................................... 6, 10, 34

42 U.S.C. § 300gg-13(a)(4)............................................................................... 5

42 U.S.C. § 2000bb *et seq.* .......................................................................*passim*

42 U.S.C. § 2000cc-5(7)(A) .............................................................................. 8

Pub. L. 111-148, §1563(e)-(f) ........................................................................... 6


**Regulations**

75 Fed. Reg. 41726............................................................................................ 5

76 Fed. Reg. 46621-23-24...........................................................................*passim*

76 Fed. Reg. 46626.................................................................22, 27, 28

77 Fed. Reg. 8725.................................................................6

*Other Authorities*

ACLU Press Release, "ACLU Applauds CA Supreme Court Decision Promoting
    Women's Health and Ending Gender Discrimination in Insurance
    Coverage" (Mar. 1, 2004) .............................................................30

CBS News "Feds to stop funding Texas women's health program"
    (Mar. 9, 2012).................................................................19

Guttmacher Institute, "Facts on Contraceptive Use in the United States,"
    June 2010.................................................................18

HHS, "A statement by U.S. Department of Health and Human Services Secretary
    Kathleen Sebelius," (Jan. 20, 2012) .............................................19

HRSA, http://www.hrsa.gov/womensguidelines/ .....................................5

HealthCare.gov, "Small Business"...................................................22

HealthReform.gov, "Fact Sheet: Keeping the Health Plan You Have: The
    Affordable Care Act and "Grandfathered" Health Plans" .............................22

Index of CCIIO Regulations and Guidelines
    http://cciio.cms.gov/resources/regulations/index.html .................................22

## INTRODUCTION

The Defendants collectively seek to force citizens to violate their sincerely held religious beliefs merely because those citizens own and operate a business in the United States of America. Defendants' national mandate of birth control and abortifacient coverage in health insurance (hereinafter "Mandate")[1] disregards religious conscience rights that are enshrined in federal statutory and constitutional law. Those rights squarely protect the Plaintiffs in this case, the Hahn family and Conestoga Wood Specialties Corporation, collectively, (hereinafter "Conestoga"). The Mandate's burdens on Conestoga's beliefs cannot be reconciled with the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* (RFRA), because (among many other reasons) there are obvious less religiously restrictive means for the government to pursue free contraception (which, of concern to the Hahns and Conestoga includes abortifacients), such as for the government itself to subsidize such services.

Four courts so far have protected corporations like Conestoga and their owners from the Mandate. *O'Brien v. United States Dep't of Health and Human Servs.*, No: 12-3357 (8th Cir. Nov. 28, 2012) (granting a motion providing for injunctive relief against the Mandate pending appeal); *Newland v. Sebelius*, ___F.Supp.2d ___ , 2012 WL 3069154 (D. Colo. July 27, 2012) (granting a preliminary injunction against the Mandate); *Legatus v. Sebelius*, ___F.Supp.2d ___, 2012 WL 5359630 (E.D. Mich. Oct.

---

[1] As described below, the Mandate consists of a conglomerate of regulations, guidelines, indirect statutory authority and penalties.

31, 2012) (same); *Tyndale House Publishers, Inc. v. Sebelius*, ___ F.Supp.2d ___, 2012 WL 5817323 (D.D.C. Nov. 16, 2012) (same).

Defendants' own behavior shows that their Mandate is not in furtherance of a compelling interest "of the highest order" as required by *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 433 (2006) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). They offer a multitude of secular and even religious exemptions to the Mandate, but refuse to respect the beliefs of Conestoga. The Mandate does not apply to approximately 191 million Americans covered by "grandfathered" plans, the Amish, small employers, churches, religious organizations that primarily serve their members, and others.

This arbitrary regulation of exemptions further illustrates that the Mandate violates the religion clause of the First Amendment. A law cannot burden religious exercise while offering such a variety of other exemptions implicating the same interests. *See, e.g., Blackhawk v. Pennsylvania*, 381 F.3d 202,209 (3d Cir. 2004); *O Centro Espirita*, 546 U.S. at 432–37 (2006). Such a scheme is not "neutral" or "generally applicable."

The Mandate also engages in entanglement with and hostility to religious beliefs in violation of the First Amendment's Establishment Clause. Defendants have taken it upon themselves to decide who is, and who is not, sufficiently "religious" to receive the largesse of their accommodations. The Mandate attempts to marginalize certain expressions of religious beliefs by declaring that entities do not qualify for an exemption

unless they are churches or religious orders that primarily serve, hire, and inculcate beliefs upon their own adherents. This establishes a caste system of religious believers, favoring some while punishing others, such as Conestoga here. This is government establishment of religion in one of the most basic senses of the phrase. *Colo. Christian U. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008). Defendants are, additionally, violating Conestoga's freedom not to speak through the "counseling" that the Mandate requires.

Defendants' illegal Mandate poses an urgent threat to the Hahns and their family business Conestoga. The Mandate will force them, starting in January 1, 2013, to add objectionable items into their health plan. If this Court does not issue preliminary injunctive relief against the applicability of the Mandate to Conestoga prior to December 31, 2012, Defendants will irreparably trample on Conestoga's federal rights and injure their ability to obtain final relief.

## FACTUAL BACKGROUND

Conestoga's Verified Complaint is incorporated herein by reference thereto and fully set forth herein. Conestoga is a family owned and operated wood cabinet and wood specialty products manufacturing business in East Earl, Pennsylvania with additional facilities in other states. Verified Complaint ("VC") ¶ 11–14 (5:12-cv-06744-MSG, Doc. # 1). Norman Hahn, Norman Lemar Hahn and Anthony H. Hahn are owners and members of the Board of Directors of Conestoga Wood Specialties Corporation. *Id.* Anthony H. Hahn is also the President and Chief Executive Officer of Conestoga. *Id.*

3

His father, Norman Hahn is the Vice Chairman of the Board of Directors. *Id.* Norman Lemar Hahn is Chairman of the Board of Directors. *Id.* Together the Hahns are responsible for all of Conestoga'ss corporate operations, which includes approximately 950 employees. VC ¶¶ 15, 34.

The Hahns are of the Mennonite faith, and strive through their operation of Conestoga (and in all the other aspects of their lives) to follow the teachings of the Mennonite faith. VC ¶¶ 25 - 32. The Hahns' commitment to Mennonite religious ethics permeates their management of Conestoga. *Id.* They have established a vision and mission statement for Conestoga that strives " ... professional environment founded upon the highest ethical, moral and Christian principles reflecting respect, support and trust for our customers, our suppliers, our employees and their families." VC ¶ 31. Under the Hahns' management of Conestoga, they have donated substantial sums to a variety of charitable and community organizations every year above and beyond their giving to their respective churches. VC ¶ 33. For several years the Hahns have implemented a program within Conestoga to more thoroughly conform its management and company culture to religious ethical principles that derive from their religious beliefs about how people flourish in the workplace and beyond. VC ¶ 29.

In exercise of their sincerely and deeply held Mennonite beliefs, Conestoga opposes offering employee health insurance coverage of any form of contraception that has an abortifacient effect. VC ¶¶ 30–32. Conestoga's next plan-year begins January 1,

4

2013. VC ¶ 35.   To finalize the employees health insurance plan for next year, the coverage to be provided by December 31, 2012.

Defendants have mandated that Conestoga violate their deeply held religious beliefs by providing coverage for abortifacient contraception and education and counseling in favor of the same in their employee health plan starting with the January 1, 2013 plan year. VC ¶¶ 4-5, 35-37, 67-68. The Patient Protection and Affordable Care Act of 2010 (PPACA) did not require this Mandate. But it did require that health plans include coverage of yet-to-be-specified preventive health services, including preventive care items for women, at no cost-sharing to patients. 42 U.S.C. § 300gg-13(a)(4). Defendants issued regulations ordering HHS's Health Resources and Services Administration (HRSA) to decide what would be mandated as women's preventive care. 75 Fed. Reg. 41726–60 (July 19, 2010). HRSA issued such guidelines in July 2011, mandating that preventive care for women include "All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." http://www.hrsa.gov/womensguidelines/. Very shortly thereafter Defendants issued an "interim final rule" endorsing HRSA's guidelines as applied to plan years beginning after August 1, 2012, and granting "additional discretion" to HRSA to exempt some religious objectors from the Mandate, according to a specific religious definition. 76 Fed. Reg.

46621–26 (Aug. 3, 2011).  At last, Defendants issued final regulations by adopting the Aug. 3 regulations "without change." 77 Fed. Reg. 8725–30 (Feb. 15, 2012).

    If Conestoga adheres to their religious beliefs, the Mandate automatically triggers a variety of penalties. VC ¶¶ 49-53. Section 1563 of PPACA incorporates the preventive care requirement into the Internal Revenue Code as well as ERISA. *See* "Conforming Amendments," Pub. L. 111-148, §1563(e)-(f).  This results in penalties through the Treasury Department of approximately $100 per employee *per day* on Conestoga if they continue providing their employees with generous health insurance coverage but omit the mandated items to which they object.  26 U.S.C. § 4980D.  Furthermore, the law imposes a $2,000 per employee per year penalty on Conestoga if they omit health insurance altogether. 26 U.S.C. § 4980H.  Meanwhile, the Labor Department as well as Conestoga's plan participants are authorized to sue Conestoga for omitting the objectionable mandated coverage, and those suits can specifically force the Conestoga to violate their beliefs by providing the objectionable coverage.  29 U.S.C. § 1132.

    This Court is Conestoga's only recourse from the Mandate's assault on their religious freedom. VC ¶¶ 84-85.  Conestoga's health plan is not grandfathered from the Mandate, nor does it meet the variety of other secular or religious exemptions Defendants and federal law have chosen to provide. VC ¶¶ 55-57, 65-72. Conestoga has no adequate remedy at law.  VC ¶¶ 84-85.  Unless this Court orders preliminary injunctive relief to Conestoga before December 31, 2012, so as to prevent the Mandate's applicability to

them, Conestoga will suffer irreparable harm by Defendants' coercion, because it blatantly violates long standing religious conscience protections found in federal statute and the constitution. VC ¶¶ 96-140.

## ARGUMENT

To be successful, a motion for a preliminary injunction must demonstrate: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. *Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700 (3d Cir. 2004). Each of these four factors favors injunctive relief in the instant case.

## I.   Conestoga Is Likely to Succeed on the Merits.

### A. The Mandate violates RFRA.

Defendants' Mandate is a textbook violation of the Religious Freedom Restoration Act (RFRA). That statute provides:

(a)   In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b)   Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1)   is in furtherance of a compelling governmental interest; and

(2)   is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. 2000bb-1. RFRA applies against actions of the federal government. *O Centro Espirita*, 546 U.S. at 424 n.1. RFRA adopts a strict scrutiny rule against federal burdens of religious exercise, to curtail the perceived lower standard applied in *Employment Division v. Smith*, 494 U.S. 872 (1990). *See O Centro Espirita*, 546 U.S. at 424.

### 1.   The Mandate substantially burdens Conestoga's exercise of religion.

Conestoga's operation of their health insurance plan according to their religious beliefs is the "exercise of religion" under RFRA. RFRA "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). This includes not merely worship but actions in accordance with one's religious beliefs. In *Sherbert v. Verner*, 374 U.S. 398, 399 (1963), an employee's religious beliefs forbade her from working on Saturdays. In *Wisconsin v. Yoder*, 406 U.S. 205, 208 (1972), parents had religious beliefs that prohibited them from sending their children to high school. In *Thomas v. Review Board*, 450 U.S. 707, 709 (1981), a worker objected to participating in the production of war materials.[2] *See also Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 360 (3d Cir. 1999) (concerning a police officer's belief that wearing a beard was religiously required).

---

[2] *Smith* reaffirmed that "the 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts," for example, "abstaining from certain foods or certain modes of transportation." 494 U.S. at 877.

Therefore Conestoga's operation of their business in compliance with their religious beliefs against providing coverage for contraception with an abortifacient effect and education thereof is part of their "exercise of religion" under RFRA.

The Mandate imposes far more than a substantial burden on Conestoga's religious beliefs, because it directly mandates that they violate those beliefs. Following Congress' intent "to create a broad definition of substantial burden," a "substantial burden" is imposed "where: (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Washington v. Klem,* 497 F.3d 272, 280 (3d Cir.2007) (finding a substantial burden on a prisoner's belief to read four religious books a day by a prison guideline allowing him to keep ten books and also access a library). Such a burden happens, even in indirect instances, such as where a law forces a person or group "to choose between following the precepts of [their] religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of [their] religion in order to accept [government benefits], on the other hand." *Sherbert,* 374 U.S. at 404. *Sherbert* held that it was "clear" that denying unemployment benefits to an employee was a substantial burden, even though the law did not directly command her to violate her beliefs against working on Saturdays. *Id.* at 403–04; *see also Klem,* 497 F.3d at 280 n.7 (circuit

definition "incorporates the holdings of both *Sherbert* and *Thomas*"). Here, the coercion is even more direct in the cover of a mandate that forces Conestoga's to violate their beliefs against offering coverage for contraception with an abortifacient effect.

In *Yoder*, the Court treated it as a substantial burden when the parents who refused to send their children to high school "were fined the sum of $5 each." 406 U.S. at 208. Here, Conestoga faces crippling fines and lawsuits unless they violate their religious principles by providing coverage of abortifacient contraception to which they religiously object. Defendants' Mandate imposes penalties of $100 per employee per day if they omit these items from their plan, and $2,000 per employee per year if they drop health insurance (plus the inherent harm to their employees, and to their competitive provision of benefits, that would come from dropping coverage). 26 U.S.C. §§ 4980D & 4980H. The Mandate further authorizes lawsuits by plan participants and the Secretary of Labor to force Conestoga to provide coverage in violation of their beliefs. 29 U.S.C. § 1132. The mere fact that the Mandate imposes a federal law requirement on Conestoga puts them at risk in innumerable situations, such as contracts, that may require them to comply with "all federal laws." The Supreme Court found that "a fine imposed against appellant" to be a quintessential burden. *Sherbert*, 374 U.S. at 403–04. That is the penalty present here.

In several lawsuits against this Mandate, the government has argued that a for-profit entity is categorically incapable of exercising religion. However, four federal

courts have granted injunctions against the Mandate for for-profit employers, including the Eighth Circuit as well as three district courts, which explicitly relied on those companies' RFRA claims. *O'Brien,* No:12-3357 (8th Cir. Nov. 28, 2012) (granting a motion for injunctive relief against the Mandate pending appeal); *Newland,* 2012 WL 3069154 at *17; *Legatus,* 2012 WL 5359630 at *9 (finding that a corporation may assert the religious rights of its owners); *Tyndale House Publishers,* 2012 WL 5817323 at *14 (same). *See also Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1120 (9th Cir. 2009) (finding that a for-profit corporation may assert the religious rights of its owners, who are burdened to the same extent the government coerces their businesses); *EEOC v. Townley Eng'g & Mfg. Co.,* 859 F.2d 610, 620 n.15 (9th Cir. 1988) (same). Moreover, there is no doubt that corporations like Conestoga are covered by the protections of RFRA because RFRA applies to "persons," and the general definition included in 1 U.S.C. § 1 provides: "In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' includes corporations . . . as well as individuals." It "is well understood that corporations should be treated as natural persons for virtually all purposes of constitutional and statutory analysis." *Monell v. Dept. of Social Services,* 436 U.S. 658, 687 (1978). *See also Citizens United v. Federal Election Comm'n,* 130 S. Ct. 876, 899 (2010) (applying First Amendment protections to corporations as persons).

11

Contrary to *Newland*, *Legatus*, and *Tyndale*, the government has recently relied on two district court decisions against RFRA challenges to the Mandate. *O'Brien v. United States Dep't of Health and Human Servs.*, ___ F.Supp.2d ___, 2012 WL 4481208, at (E.D. Mo. 2012), *appeal docketed*, No. 12-3357 (8th Cir. Oct. 1, 2012); *Hobby Lobby Stores, Inc. v. Sebelius*, ___ F.Supp.2d ___, 2012 WL 5844972 (W.D. Okla. Nov. 19, 2012), *appeal docketed*, No. 12-6294 (10th Cir. Nov. 20, 2012).

But, as observed above, the Eight Circuit, on appeal of the *O'Brien* decision, granted a motion for an injunction pending appeal (procedurally labeled a motion for "stay") blocking enforcement of the Mandate during the appeal. *O'Brien*, No: 12-3357 (8th Cir. Nov. 28, 2012). Because injunctive relief pending appeal requires the same elements of injunctive relief in other contexts, including a likelihood of success on the merits, this negates the precedential value of the erroneous *O'Brien* district court decision. *See Shrink Missouri Government PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998) (injunction pending appeal requires showing of likelihood of success on merits). Likewise, *Hobby Lobby* relied extensively on *O'Brien*, and is now an outlier on this issue.

The government's rationale says that payment into a health insurance plan that covers objectionable practices is merely "indirect" support of a practice. *O'Brien*, 2012 WL 4481208 at \*6; *Hobby Lobby*, 2012 WL 5844972 at \*23. However, these are impermissible judicial decisions of moral theology.   The Court may not judge for a

religious practitioner that promotion of abortifacients is morally acceptable if it is not too proximate. The Supreme Court rejected the same attempt in *Thomas*, where the government deemed the armament manufacturing activity to which the plaintiff objected "sufficiently insulated" from his objection to war. 450 U.S. at 715. "Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one. Courts should not undertake to dissect religious beliefs . . . ." *Id. See also Newland*, 2012 WL 3069154 at *6 n.9 (rejecting the government's burden argument "out of hand").

The government's position likewise contradicts *United States v. Lee*,     455 U.S. 252 (1982), which explicitly held that the for-profit religious plaintiff had met its showing to establish a sufficient burden for a free exercise of religion claim. 455 U.S. at 257. In doing so, the Court rejected the government's attempt to insist that despite the Conestoga's sincerity of beliefs, there was no substantial burden on "the integrity of the Amish religious belief or observance." *Id.* Instead the Supreme Court found the burden sufficiently "interferes with the free exercise rights of the Amish." *Id. Lee* stated that determining the burden did not sufficiently violate the faith to satisfy a free exercise claim would be an interpretation of faith that is "not within 'the judicial function and judicial competence'" *Id.* (quoting *Thomas*, 450 U.S. at 716). The invitation by the government to judge between different levels of moral culpability is incompatible with the Supreme Court definition of substantial burden, by which it is not a measure of religious beliefs, but is a measure of the "pressure" the government applies against

13

beliefs. *Thomas*, 450 U.S. at 718. As explained above, the Mandate here explicitly orders a violation of beliefs and imposes intense penalties as pressure to do so. The government also incorrectly argues that a burden on a company is somehow remote from the close family owners and operators of that company who must violate their religious beliefs and use their property to execute the order. The Court in *Tyndale House Publishers* rightly observed that this view is contrary to precedent such as *Stormans* and *Townley*. *Tyndale House Publishers,* 2012 WL 5817323 at *814 (identity of burden on owners and company "is precisely what those cases held").

The Mandate here is even more proximate than the substantial burden found in *Lee*, because Conestoga here must provide objectionable coverage directly to other private citizens, whereas in *Lee* they sent the money to a multi-trillion dollar budget in Washington. The government would constrain free exercise to personal matters, but would allow the government to coerce believers to help other people engage in objectionable activities. *O'Brien*, 2012 WL 4481208 at *6; *Hobby Lobby*, 2012 WL 5844972 at *18. This idea severely constricts the First Amendment and RFRA (which protects "any" free exercise of religion, not merely freedom of worship). Instead, *Lee* requires that the Court recognize a sufficient burden showing and apply the applicable scrutiny level, which is strict scrutiny under RFRA and *O Centro*. Therefore, this court should follow *Newland, Legatus, Tyndale House* and the Eight Circuit in *O'Brien* in

14

granting injunctive relief since the Mandate substantially burdens both Conestoga'ss and the Hahns exercise of religion.

### 2. Other means would be less restrictive of Conestoga's religious exercise.

Before this memo addresses why Defendants cannot show a compelling interest, it is worthwhile considering that even if such an interest existed, the government could not possibly show that the Mandate is "the least restrictive means of furthering" it under 42 U.S.C. 2000bb-1. Defendants bear the burden to show both of these elements—compelling interest and least restrictive means—including at the preliminary injunction stage. *O Centro Espirita*, 546 U.S. at 428–30 ("[T]he burdens at the preliminary injunction stage track the burdens at trial. . . . RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the [compelling interest] test," such as for speech claims under the First Amendment.").

Defendants fail the least restrictive means test simply because the government could, if the political will existed, achieve its desire for free coverage of birth control *by providing that benefit itself.* Rather than coerce Conestoga to provide this coverage in their plan, the government could possibly create its own "contraception insurance" plan covering all the items the Mandate requires, and then allow free enrollment in that plan for whomever the government seeks to cover. Another course of action could be for the government to directly compensate providers of contraception, or offer tax credits or deductions for contraceptive purchases, or impose a mandate on the contraception

manufacturing industry to give its items away for free.[3] These and other options could fully achieve Defendants' goal while being less restrictive of Conestoga's beliefs. There is no essential need to coerce Conestoga or other religious objectors to provide the objectionable coverage themselves.

Defendants cannot deny that the government could pursue its goal more directly. This conclusion is not only dictated by common sense, but is also proven because the federal government and many states already directly subsidize birth control coverage for many citizens through Title XIX/Medicaid and Title X/Family Planning Services funding. Thus the Court's RFRA analysis may stop here by finding that the Mandate is not the least restrictive means of furthering Defendants' interest. Other options may be more difficult to pass as a political matter, (which further illustrates the public's disbelief that the Mandate's interest is "compelling"). Indeed PPACA itself does not require the Mandate. But political difficulty does not exonerate the Mandate's burdens on Conestoga's religious beliefs, or allow it to pass RFRA's strict scrutiny. "Nor can the government slide through the test merely because another alternative would not be quite as good." *Hodgkins v. Peterson,* 355 F.3d 1048, 1060 (7th Cir. 2004); Strict scrutiny requires the government, rather than burdening fundamental rights, to pursue other methods that involve its own efforts and expenses even if they are less direct. *See Riley*

---

[3] And by virtue of Defendants' recent attempts to quell political backlash by claiming they may create an "accommodation" for some additional religious entities (but still not for Conestoga), Defendants are necessarily admitting that the Mandate is not the least restrictive means to achieve their goals. *See* 77 Fed. Reg. 16501–08 (Mar. 21, 2012)

*v. National Federation of the Blind of North Carolina, Inc.,* 487 U.S. 781, 799-800 (1988) (government interest could be served by its own speech advertising and by enforcement of fraud laws instead of by compelling speakers to delivers its message). Since many methods less restrictive of religious beliefs exist, *see e.g., Newland*, 2012 WL 3069154 at *17 ("Given the existence of government programs similar to Conestoga's proposed alternative, the government has failed to meet this burden" of demonstrating that the Mandate is the least restrictive means), this alone fatally undermines Defendants' burden under RFRA and the Mandate from applying to Conestoga.

### 3. The Mandate is not justified by a compelling interest.

Defendants cannot establish that their coercion of Conestoga is "in furtherance of a compelling governmental interest." RFRA, with "the strict scrutiny test it adopted," *O Centro Espirita*, 546 U.S. at 430, imposes "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). A compelling interest is an interest of "the highest order," *Lukumi*, 508 U.S. at 546, and is implicated only by "the gravest abuses, endangering paramount interests," *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

Defendants cannot propose such an interest "in the abstract," but must show a compelling interest "in the circumstances of this case" by looking at the particular "aspect" of the interest as "addressed by the law at issue." *Cal. Democratic Party v.*

*Jones*, 530 U.S. 567, 584 (2000); *O Centro Espirita*, 546 U.S. at 430–32 (RFRA's test can only be satisfied "through application of the challenged law 'to the person'—the particular claimant"); *see also Lukumi,* 508 U.S. at 546 (rejecting the assertion that protecting public health was a compelling interest "in the context of these ordinances"). The government must "specifically identify an 'actual problem' in need of solving" and show that coercing Conestoga is "actually necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (June 27, 2011). If Defendants' "evidence is not compelling," they fail their burden. *Id.* at 2739. To be compelling, the government's evidence must show not merely a correlation but a "caus[al]" nexus between their Mandate and the grave interest it supposedly serves. *Id.* The government "bears the risk of uncertainty . . . ambiguous proof will not suffice." *Id.*

Defendants' interest in coercing Conestoga to provide coverage of abortifacient contraception is not compelling. No "grave" or "paramount" crisis justifies this Mandate on Conestoga. Never in the history of the United States has the federal government forced religiously objecting employers to cover abortifacient contraception in their employee health plans. Until August 1, 2012, at the earliest, no such federal mandate existed. Yet a large majority of Americans already have contraceptive coverage.[4] Defendant Sebelius has admitted that "contraceptive services are available at sites such as

---

[4] Nine out of ten employers, pre-Mandate, already provide a "full range" of contraceptive coverage. Guttmacher Institute, "Facts on Contraceptive Use in the United States," June 2010, *available at* http://www.guttmacher.org/pubs/fb_contr_use.html (last accessed Dec. 3, 2012).

community health centers, public clinics, and hospitals with income-based support."[5] Such "income-based support" is available through federal government subsidies in Title XIX/Medicaid and Title X/Family Planning Services, as well as through subsidies by state governments.[6]   And the availability of contraceptive items for sale is ubiquitous, now reaching even vending machines on college campuses.  Defendants therefore cannot claim a grave interest in the scarcity of contraception coverage in health insurance.  To the extent they claim an interest in increasing access to contraception on the margins, *Brown* declared: "government does not have a compelling interest in each marginal percentage point by which its goals are advanced."  131 S. Ct. at 2741.

Defendants cannot show, as they must, a compelling interest with respect to the even-tinier fraction of American employees who work for religiously-objecting employers.  A generalized, "abstract" interest in the benefits of contraception for women will not suffice; Defendants must demonstrate their interest with respect to Conestoga's own employees, *see O Centro Espirita*, 546 U.S. at 430–32, proving the government has

---

[5] "A statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius," (Jan. 20, 2012), *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html (last accessed Dec. 3, 2012).

[6] Defendants have shown that they do not believe a compelling interest exists to promote contraceptive access.  In Texas, HHS has decided to cease providing 90% of funding of a $40 million Texas Women's Health family planning program.  Texas had been using that funding to provide thousands of women with family planning, but Texas required funding providers to not, directly or indirectly, provide abortion.  On this basis alone HHS withdrew federal funding, which Defendant Sebelius admitted would cause "a huge gap in family planning."  HHS decided that protecting the interests of abortion providers is more important than providing contraception access.  *See* CBS News "Feds to stop funding Texas women's health program" (Mar. 9, 2012), *available at* http://www.cbsnews.com/8301-501363_162-57394681/feds-to-stop-funding-texas-womens-health-program/ (last accessed Dec. 3, 2012).

no choice but to coerce Conestoga. In *O Centro Espirita*, the Court held evidence to be insufficient showing that Schedule I controlled substances were "extremely dangerous," because that "categorical" support could not meet the government's RFRA burden to consider the "particular" exception requested by the Plaintiff's. *Id.* at 432.

Defendants' must also show that their alleged harm to Conestoga's employees is not mild, but extreme: that it threatens the "gravest," "highest" and most "paramount" consequences for Conestoga's employees absent the Mandate. But the Mandate's regulations cite no rash of contraception-deprived deaths among employees of religiously-devout employers. They also cite no pandemic of unwanted births causing catastrophic inequalities among such employees. Defendants do not know whether employees of Conestoga and similar entities experience negative health consequences absent the Mandate. But Defendants "bear the risk of uncertainty," and cannot satisfy their burden under RFRA with speculation and generalizations.

Under *Brown*, Defendants must additionally demonstrate a *causal* connection between some allegedly grave harm to Conestoga's employees, and Conestoga's failure to comply with the Mandate. Defendants have failed to show that women are suffering grave health and equality effects absent this Mandate as applied to religiously objecting Conestoga. They have not shown that women who would receive these benefits are not already getting abortifacient contraception through other means. Defendants have no scientific causal evidence indicating that the Mandate (as opposed to contraception

generally) has any effect whatsoever on unintended pregnancy so as to improve health and equality. Twenty-eight states have passed contraceptive coverage mandates, and the government has no evidence that even one of those state mandates resulted in "the highest order" of benefit to health and equality. In short, Defendants cannot connect the Mandate to *causation* of grave harm among Conestoga's employees. *See also O Centro Espirita*, 546 U.S. at 438 (where "the Government did not even *submit* evidence addressing" the specific consequences of an alleged interest, but only offered affidavits "attesting to the general importance" of that interest, "under RFRA invocation of such general interests, standing alone, is not enough.")

The most ironic flaw in Defendants' assertion of a compelling interest is that the federal government itself has voluntarily omitted millions of employees from the Mandate for secular and religious reasons, but Defendants still refuse to exempt Conestoga. The Mandate does not apply to thousands of plans that are "grandfathered" under PPACA. See Mandate, 76 Fed. Reg. at 46623 & n.4. The government's own data shows that 191 million Americans will be covered in grandfathered plans that are *not* subject to the Mandate in 2013.[7] This included the fact that "most" large employers – so, most employers similarly situated to Conestoga here – will not be subject to the Mandate

---

[7] *Newland,* 2012 WL 3069154 at *1; *Tyndale House Publishers,* 2012 WL 5817323 at *18.

due to the government's own exclusion of grandfathered plans.[8]   In addition, employers with less than 50 full-time employees are not required by PPACA to provide health insurance coverage at all, which may allow them to avoid the Mandate.[9]   Also, the Mandate does not apply to members of a "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds.   26 U.S.C. §§ 5000A(d)(2)(a)(i) and (ii).   The Mandate exempts from its requirements "religious employers" defined as churches or religious orders that primarily hire and serve their own adherents and have the purpose of inculcating their values.   Mandate, 76 Fed. Reg. at 46626. The federal government has decided that employers in any of these categories do not face various penalties for failing to comply with the Mandate.[10]

---

[8] HealthReform.gov, "Fact Sheet: Keeping the Health Plan You Have: The Affordable Care Act and "Grandfathered" Health Plans," *available at* http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html (last accessed Dec. 3, 2012) (estimating that 55% of 113 million large-employer employees, and 34% of 43 million small-employer employees, will be in grandfathered plans in 2013).

[9] See 26 U.S.C. § 4980H(c)(2) (employers are not subject to penalty for not providing health insurance coverage if they have less than 50 full-time employees); HealthCare.gov, "Small Business," *available at* http://www.healthcare.gov/using-insurance/employers/small-business/ (last accessed Dec. 3, 2012).

[10] Also notably, the government has granted many discretionary waivers to the requirements of PPACA, some including this Mandate. *See, e.g.,* Index of CCIIO Regulations and Guidance available at http://cciio.cms.gov/resources/regulations/index.html (last visited Dec. 3, 2012) (referencing multiple waivers). And apparently, PPACA does not impose its penalty on large employers dropping coverage altogether in states that choose not to set up state insurance exchanges, since 26 U.S.C. § 4980H is only triggered by employee enrollment in an exchange plan receiving PPACA health insurance premium credits, and those subsidies only flow to state exchange plans, not to federally-created exchange plans. *See, e.g.,* Amended Complaint at ¶ 10, filed in *Oklahoma v. Sebelius,* No. 11-cv-00030 (E.D. Okla. Filed Sept. 19, 2012).

These are massive exemptions that cannot coexist with a compelling interest against Conestoga. *O Centro Espirita*, 546 U.S. at 434 (since the law does "not preclude exceptions altogether; RFRA makes clear that it is the obligation of the courts to consider" whether "exceptions" must also be afforded because of RFRA). Defendants cannot claim a "grave" or "paramount" interest to impose the Mandate on Conestoga or other religious objectors while allowing 191 million employees to be "unprotected." "[A] law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 520; *see also Blackhawk*, 381 F.3d at 209 (laws undermine their interests when they offer secular exemptions but refuse similarly-situated religious exemptions). No compelling interest exists when the government "fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort." *Lukumi*, 508 U.S. at 546–47. The exemptions to the Mandate "fatally undermine[] the Government's broader contention that [its law] will be 'necessarily . . . undercut'" if Conestoga is exempted too. *O Centro Espirita*, 546 U.S. at 434.

Defendants' grandfathering exemption has nothing to do with a determination that nearly 200 million Americans do not need contraceptive coverage while Conestoga's employees somehow do. The exemption allowed President Obama claim, "If you like your health care plan, you can keep your health care plan."[11] If the government exempt

---

[11] *See* http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html (last visited Dec. 3, 2012).

the "health" and "equality" interests of such a massive group of citizens their "interest" in mandating cost-free birth control coverage cannot possibly be "paramount" or "grave" enough to justify forcing Conestoga to violate their religious beliefs. *See O Centro Espirita*, 546 U.S. at 434 ("Nothing about the unique political status of the [exempted peoples] makes their members immune from the health risks the Government asserts").

In *O Centro Espirita* the Supreme Court held that no compelling interest existed behind a law that had a much more urgent goal, regulating extremely dangerous controlled substances, and that had many fewer exemptions than the broad swath of omissions from the Mandate. In that case the Court dealt with the Controlled Substances Act's prohibition on "all use," with "no exception," of a hallucinogenic ingredient in a tea along with other Schedule I substances. 546 U.S. at 423, 425. But because elsewhere in the statute there was a narrow religious exemption for Native American use of a different substance, peyote, the Court held that the government could not meet its compelling interest burden even in its generalized interest in to regulate Schedule I substances as applied to the Plaintiff in that case. *Id.* at 433. Of even greater importance in the matter at issue here, namely that the government cannot satisfy its burden by pointing to general health benefits of contraception. Halting the use of extremely dangerous drugs is far more urgent than forcing religious objectors to provide contraception coverage. Defendants' grant of secular and religious exemptions for millions of other employees betrays any alleged compelling interest they may have in forcing Conestoga to comply

with the Mandate against their religious beliefs. *See e.g., Newland*, 2012 WL 3069154 at *14-15 (explaining that since the "government has exempted over 190 million health plan participants," "this massive exemption completely undermines any compelling interest); *Tyndale House Publishers*, 2012 WL 5817323 at *33 (quoting *Lukumi*, 508 U.S. at 547, for the proposition that a "law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited," and ultimately finding that there is no compelling interest in failing to give an exemption to that corporation).

### B. The Mandate violates Conestoga's right to Free Exercise of Religion.

The Mandate also violates the free exercise clause of the First Amendment of the United States Constitution. "At minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532. When the "object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Id*. at 533. The object of a law can be determined by examining its text and operation. *Id*. at 534–35.

### 1. The Mandate is not generally applicable because it disfavors religion.

The Mandate lacks "general applicability." Laws lack general applicability when they are underinclusive. *Id*. at 543. "The Free Exercise Clause protects religious

observers against unequal treatment, and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.* at 542–43 (internal quotation marks and citation omitted). "A law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated." *Blackhawk,* 381 F.3d at 209 (citing *Lukumi, 1508 U.S. at 543-46).* In *Lukumi,* the Court said that the underinclusiveness of the city's ban on animal sacrifice was "substantial" because it "fail[ed] to prohibit nonreligious conduct that endangers these interests [in public health and preventing animal cruelty] in a similar or greater degree than Santeria sacrifice does." 508 U.S. at 542-43.

The Mandate is massively underinclusive, yet Defendants refuse to offer Conestoga an exemption. As described above, nearly 200 million Americans will be exempt from the Mandate in 2013 because their plans will be grandfathered. Mandate, 76 Fed. Reg. at 46623 & n.4; *Newland,* 2012 WL 5817323 at *18. The Mandate also does not apply to small employers who have the option of dropping insurance, to religious sects opposed to insurance, and to "religious employers" that the Mandate defines as exempt, to entities granted discretionary waivers, and others. Health insurance plans covering millions of Americans can omit all the mandated items and cause all the

same harm alleged by Defendants, but Conestoga still must comply even in violation of their religious beliefs.

There is no physiological or psychological difference between employees that work for religious minded employers and other employees, making contraception beneficial for the latter but not for the former. Defendants have chosen to offer an exemption for some religious employers but they refuse to exempt Conestoga a for profit corporation based on their religious beliefs. The overall apparent intent of the Mandate, selectively allowing secular and religious exemptions, shows that it is a quintessential "not generally applicable law".

The Mandate is not "generally applicable" because it contains both categorical and discretionary exemptions for a variety of reasons, but refuses to exempt objectors such as Conestoga. In cases striking down religiously burdensome laws containing exemptions, Judge Alito explained for the Third Circuit that strict scrutiny applies when discretionary or categorical exemptions exist but religious objections are denied. *Blackhawk*, 381 F.3d at 209; *Fraternal Order of Police*, 170 F.3d at 365. Here, in addition to the Mandate's categorical exemptions such as for grandfathered plans, Defendants admit that they possess "discretion" over the exemption they created for "religious employers" *and the scope of who is covered.* Mandate, 76 Fed. Reg. at 46623–24; 77 Fed. Reg. at 8726. Defendants admit that they could have exempted Conestoga and other non-church

religious objectors, but they chose not to. Meanwhile, their scheme exempts tens of millions for secular reasons.

### 2. The Mandate is not neutral towards religion.

The Mandate's exemptions also show it is not neutral towards religion. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." *Lukumi*, 508 U.S. at 533. The Mandate explicitly exempts some "religious employers" but not others. This exemption is based on a variety of religious criteria including whether the "inculcation of religious values is the purpose" of the entity, whether "persons who share the religious tenets of" the group are those whom the group primarily hires or serves, and whether the group is a church or religious order. Mandate, 76 Fed. Reg. at 46626. The religious employer definition in the Mandate imposes Defendants' *theological* notion that employers are only religious if they are churches who stay in their own four walls and focus on self-serving purposes. Defendants have created a caste system of religious employers, favoring one kind of objector because their religion is insular, while penalizing Plaintiff because they pursue their religious tenets within society or the business world instead of in church. The text of the Mandate itself therefore shows an unconstitutionally discriminatory "effect of a law in its real operation," thus showing "strong evidence" that religious objectors beyond Defendants' narrow definition are the "object" of the Mandate, rather than contraceptive access. *Lukumi*, 508 U.S. at 535.

The Mandate constitutes "an impermissible attempt to target" religious objectors that are not insularly-focused. *Id*. Indeed, the Mandate's criteria impose a governmental view of what really "counts" as religion, even though some religions do not even use the vocabulary of "churches" and do not primarily exercise their beliefs in isolation. This lack of neutrality regarding the notion of what religion *is* bespeaks of a Free Exercise Clause violation. *See Braunfeld v. Brown*, 366 U.S. 599, 607 (1961) (noting that "[i]f the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect."); *see also Lukumi*, 508 U.S. at 532 (identifying a Free Exercise Clause violation where a policy prefers some religions to others).

As in *Lukumi*, the effect of the Mandate is to pick and choose between specifically religious objectors. There, the Supreme Court found an ordinance against animal sacrifice not facially neutral because its operative terms included "sacrifice" and "ritual," terms not typically associated with secular meanings. *Lukumi*, 508 U.S. at 534. But in practice, it was clear that the object of the ordinance was to exclude the "religious exercise of Santeria church members." *Id*. at 535. For example, the ordinance exempted from its prohibition almost all killings of animals, except for religious sacrifice. *Id*. at 536. The Court called this a "religious gerrymander," an impermissible attempt to target [the church] and their religious practices." *Id*. at 535. As in *Lukumi*, the Mandate here

29

exempts "religious employers" that primarily engage in the "inculcation of religious values" and focus on "persons who share the[ir] religious tenets" and are churches or religious orders.   Yet the Mandate also does not apply to hundreds of millions of employees for secular reasons, including that they are in grandfathered plans or work for small employers, and for religious reasons if they are in a religious sect opposed to insurance.  The fact that most employers already cover contraception, combined with the Mandate's constricted definition of religion, shows that the Mandate is a thinly-veiled attempt not to advance health but to target society's religious "hold outs" who possess beliefs against providing such coverage.[12]   The Mandate and its exemptions establish nothing less than a "religious gerrymander" designed to target most religions objectors to contraception, while letting millions of secular employers off the hook.    This demonstrates the lack of neutrality. *Id.* at 537–39.

### 3.  The Mandate fails strict scrutiny.

Because the Mandate is neither generally applicable nor neutral it is subject to strict scrutiny, *id.* at 546.  As explained above, Defendants cannot meet this standard.

---

[12] The Mandate's religious employer definition was drafted by the ACLU in California exclude most religious objectors. *See* ACLU Press Release, "ACLU Applauds CA Supreme Court Decision Promoting Women's Health and Ending Gender Discrimination in Insurance Coverage" (Mar. 1, 2004) ("The ACLU crafted the statutory exemption [at issue]...."), *available at* http://www.aclu.org/reproductive-freedom/aclu-applauds-ca-supreme-court-decision-promoting-womens-health-and-ending-gend (last accessed Dec. 3, 2012).

## C. The Mandate violates the Establishment Clause.

The Mandate also violates the Establishment Clause of the First Amendment. The Mandate's "religious employer" exemption, as discussed above, sets forth Defendants' notion of what "counts" as religion and what doesn't for the purposes of who will be exempt under the Mandate. But the government may not create a caste system of different religious organizations and belief levels when it imposes a burden. Instead it "must treat individual religions and religious institutions 'without discrimination or preference.'" *Colo. Christian U. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008); *Larson v. Valente*, 456 U.S. 228 (1982); *see also Wilson v. NLRB*, 920 F.2d 1282 (6th Cir. 1990) (holding that section 19 of the National Labor Relations Act, which exempts from mandatory union membership any employee who "is a member of and adheres to established and traditional tenets or teachings of a bona fide religion, body, or sect which has historically held conscientious objections to joining or financially supporting labor organizations," is unconstitutional because it discriminates among religions and would involve an impermissible government inquiry into religious tenets), *cert. denied*, 505 U.S. 1218 (1992).

Defendants used their unfettered discretion to pick and choose what criteria qualify a group as "religious" enough for an exemption, and they imposed their constricted theological view of religion on all Americans. The Mandate's four-pronged religious exemption emphasizing "the inculcation of religious values" necessarily

31

requires the government to explore a religious organization's purpose in impermissible ways. The exemption deems religious organizations insufficiently "religious" if they do not focus on co-religionists in hiring and service, which would involve the government's probing of what exactly count as the organization's religious "tenets," and which disfavors religious believers such as Conestoga who exercise their beliefs not by only working with or for Mennonites but by witnessing their faith by treating everyone with dignity according to their church's teaching. The exemption's restriction of religious employers to a tax code provision identifying churches and religious orders, whose purpose relates to whether paperwork should be filed, bears no reasonable relation to Defendants' alleged interest and is designed to discriminate against religious objectors such as Conestoga. These factors involve the government in "intrusive judgments regarding contested questions of religious belief or practice" in violation of the First Amendment. *Weaver*, 534 F.3d at 1261.

In *Weaver* the Tenth Circuit held unconstitutional a discrimination-among-religions policy that is very similar to the Mandate. The discrimination among religions in that case attempted to treat "pervasively sectarian" education institutions differently than other religious institutions, based on whether the employees and students were of one religious persuasion, the courses sought to "indoctrinate", the governance was tied to particular church affiliation, and similar factors. *Id.* at 1250–51. The Mandate here likewise draws its line around "religious employers" based on whether the people they

"hire" or "serve" share the same "religious tenets," whether its purpose is to "inculcate" values, and whether the entity is a church or affiliate. The Tenth Circuit held that such a discriminatory line violates the First Amendment, and the Court rejected as "puzzling and wholly artificial" the government's argument that their law "distinguishes not between types of religions, but between types of institutions." *Id.* at 1259–60. The Court held that "animus" towards religion is not required to find a First Amendment violation in the presence of such facial discrimination. *Id.* at 1260.

### D. The Mandate violates Conestoga's Freedom of Speech.

The Mandate additionally violates the First Amendment by coercing Conestoga to provide for speech that is contrary to their religious beliefs. The "right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (quoting *W.V. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)). Accordingly, the First Amendment protects the right to "decide what not to say." *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557, 573 (1995) (internal quotation marks omitted). Thus, "[l]aws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as those "that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 624, 642 (1994). The "First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to

foster, in the way [the government] commands, an idea they find morally objectionable." *Wooley*, 430 U.S. at 715. Here, the Mandate unconstitutionally coerces Conestoga to speak a message they find morally objectionable by requiring that they cover in their insurance plan not only contraception with abortifacient effects, but "patient education and counseling" in favor of such abortifacients, forcing Conestoga to contradict their own strongly held religious beliefs.

## II.   **Conestoga Will Suffer Irreparable Harm Absent an Injunction.**

Conestoga seek to continue offering their employee insurance plan without providing abortifacients and counseling/education for the same, and without being subject to the Mandate's harsh penalties, lawsuits and other liability. Without the requested injunction, Conestoga will be coerced in violation of their rights under RFRA and the First Amendment, causing actual and imminent loss of their religious conscience rights starting January 1, 2013. The injury is not slight but amounts to massive fines as well as lawsuits implicating court-ordered relief. 26 U.S.C. § 4980D; 26 U.S.C. § 4980H; 29 U.S.C. § 1132. The coercion of Conestoga's conscience rights and fundamental freedoms in this way is irreparable injury. *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA"); *accord Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir 1996), and *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,* 389 F.3d 973, 995 (10th Cir.2004); *see also* S*tormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). *See also Elrod v.*

34

*Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")

The free exercise interest protected by RFRA is equivalent, for irreparable harm purposes, to its constitutional derivative, especially since Congress passed RFRA specifically to provide protection for free exercise as understood in the First Amendment. *Newland,* 2012 WL 3069154 at *4 (irreparable harm established under RFRA claim against Madate); *Legatus,* 2012 WL 5359630 at *13 (same); *Tyndale House publishers,* 2012 WL 5817323 at *18 (same). Where Congress has enacted legislation to prevent the injury that forms the basis of Conestoga's claims, violating that statute constitutes irreparable injury. *Gov't of Virgin Is., Dep't of Conservation and Cultural Affairs v. Virgin Is. Paving,* 714 F.2d 283, 286 (3d Cir. 1983). The fact that Conestoga is likely to succeed on the merits of their fundamental rights claims supports a finding or irreparable injury. *See Am. Civil Liberties Union v. Reno,* 929 F.Supp, 824, 851 (E.D. Pa. 1996) ("in a case which the injury alleged is a threat to First Amendment interests, the finding of irreparable injury is often tied to the likelihood of success of the merits."), *aff'd Reno v. Am. Civil Liberties Union,* 521 U.S. 844 (1997).

## III.   An Injunction Will Cause No Harm to Defendants.

The federal government has only recently imposed this Mandate against religious objectors. Therefore Defendants can offer no evidence to show that harm will come to Conestoga's employees if an injunction issues preventing the Mandate's applicability in

violation of RFRA and the First Amendment.  Both the ubiquity of contraception access and government subsidization thereof, and the fact that the government has exempted nearly 200 million Americans from the Mandate already, make it impossible for Defendants to claim that a preliminary injunction for less than on thousand persons in this case will cause harm.

## IV.    The Public Interest Favors a Preliminary Injunction.

The Court of Appeals for the Third Circuit has determined that '[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.'" *Ramsey v. City of Pittsburgh*, 764 F. Supp. 2d 728 (W.D. Pa. 2011) (citing *AT & T v. Winback & Conserve Program*, 42 F.3d 1421, 1427, n.8 (3d Cir. 1994)).

The public interest is served by the injunction itself because "one of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable noncontested status of the parties." *Kos Pharm.*, 369 F.3d at 708 (quoting *Opticians Ass'n of Am. V. Indep. Opticians of Am.*, 920 F.2d 187 (3d Cir. 1990)). In this case, the status quo is that Plaintiffs have not provided coverage of abortifacient items and the Mandate is not yet applicable to their plan.

"[T]he State 'does not have an interest in the enforcement of an unconstitutional law[.]'" *N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 388-89 (3d Cir. 2012) (quoting *Am. Civil Liberties Union v. Ashcroft*, 332 F.3d240, 247 (3d Cir. 2003)).

Nor can the government claim the public interest demands imposing the Mandate on Conestoga to benefit its employees when, again, Defendants have voluntarily decided that 200 million Americans need not receive its benefits. The public interest is best served by preventing government officials from compelling individuals to violate their religious conscience rights protected by RFRA, the First Amendment and other laws. *See e.g. Tyndale House*, 2012 WL 5817323 at *37-38 (finding that the public interest weighs in favor of providing injunctive relief against the Mandate to vindicate rights under RFRA and the First Amendment).

## CONCLUSION

Defendants' Mandate violates both RFRA and the First Amendment due to its massive burdens on religious exercise, its arbitrary imposition and ample alternative options, and its discrimination among religions. Unless this Court issues a preliminary injunction prior to December 31, 2012, when Conestoga needs to implement their 2013 insurance plan, Conestoga will face the choice of violating their beliefs or suffering massive financial penalties, lawsuits, and potential other liability. Defendants would face no harm from an injunction against their illegal regulatory scheme that already exempt millions of others. Conestoga respectfully requests that this Court issue a preliminary injunction against Defendants' requirement that Conestoga and their insurance plan[13]

---

[13] This should include the duties of Conestoga's insurance carrier that runs the plan, because the Mandate forces Conestoga to supply abortifacient contraceptives both by penalties on itself and

comply with this so called "contraception" mandate due to the abortifacient contraception and the counseling and education for the same. A form of order is attached.[14]

Respectfully submitted this 8th day of December, 2012.

**Attorneys for Conestoga:**

_____ /s/ Randall L. Wenger
Randall L. Wenger, Esquire
PA Attorney ID Number: 86537
Independence Law Center
23 North Front Street
Harrisburg, PA  17101
717-545-0600 (phone)
717-545-8107 (fax)
rwenger@indlawcenter.org

_____ /s/ Charles W. Proctor, III
Charles W. Proctor, III, Esquire
PA Attorney ID Number:      23266
Law Offices of Proctor Lindsay & Dixon
1204 Baltimore Pike, Suite 200
Chadds Ford, PA  19317
610-361-8600 (phone)
610-361-8843 (fax)
cproctor@cplaw1.com

---

by penalizing insurance providers for providing a plan without such coverage. See § 300gg-13(a)(4).

[14] Because the public interest in this case, the lack of any financial harm to Defendants from an injunction, and all of the other factors that weigh in Conestoga's favor, Conestoga requests that the Court impose a bond of zero dollars in this instance. _RoDa Drilling Co. v. Siegal_, 552 F.3d 1203, 1215 (10th Cir. 2009) (court has discretion to order no bond). Under appropriate circumstances, the requirements for a bond may be excused, notwithstanding the literal language if Rule 65 (c). _Powelton Civic Home Owners Ass'n v. Dep't of Housing and Urban Development_, 284 F.Supp. 809, 840 (E.D. Pa. 1968).

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| CONESTOGA WOOD SPECIALTIES CORP., a PA Corporation; NORMAN HAHN; NORMAN LEMAR HAHN and ANTHONY H. HAHN<br>     *Plaintiffs,*<br>          v.<br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF TREASURY; KATHLEEN SEBELIUS, in her official capacity as Secretary of the United States Department of Health and Human Services; HILDA SOLIS, in her official capacity as Secretary of the United States Department of Labor; and TIMOTHY GEITHNER, in his official capacity as Secretary of the United States Department of Treasury.<br>     *Defendants.* | )<br>)<br>)<br>)<br>) Civil Action No. 5:12-CV-06744-MSG<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CERTIFICATION OF SERVICE

The undersigned counsel for Plaintiffs, Charles W. Proctor, III, Esquire, hereby certifies that the following counsel for Defendants were served with the proceeding document by the Court's ECF filing system on December 8, 2012:

U.S. Dep't. of Health and Human Services
200 Independence Avenue
S.W. Washington, DC 20201

Kathleen Sebelius, in her official
capacity as Secretary of the
U.S. Dep't of Health and Human Services
200 Independence Avenue
S.W. Washington, DC 20201

U.S. Dep't of the Treasury
1500 Pennsylvania Avenue
N.W. Washington, DC 20220

Timothy Geithner, in his official
capacity as Secretary of the
U.S. Dep't of Treasury
1500 Pennsylvania Avenue
N.W. Washington, DC 20220

U.S. Dep't of Labor
Frances Perkins Bldg.
200 Constitution Avenue
N.W. Washington, DC 20201

Eric H. Holder, Jr.
Attorney General of the United States
U.S. Department of Justice
20 Massachusetts Avenue
N.W. Washington, DC 20001

Linda Solis, in her official
capacity as Secretary of the
U.S. Dep't of Labor
Frances Perkins Bldg.
200 Constitution Avenue
N.W. Washington, DC 20201

Zane David Memeger
U.S. Attorney's Office
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106


    */s/ Charles W. Proctor, III*
Charles W. Proctor, III, Esquire

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

CONESTOGA WOOD SPECIALTIES CORP.,       )
             *Plaintiffs,*       )
        v.       )     Civil Action No.
UNITED STATES DEPARTMENT OF HEALTH AND       )       5:12-CV-06744-MSG
HUMAN SERVICES; UNITED STATES DEPARTMENT       )
OF LABOR; UNITED STATES DEPARTMENT OF       )
TREASURY; KATHLEEN SEBELIUS, in her official capacity       )
as Secretary of the United States Department of Health and       )
Human Services; HILDA SOLIS, in her official capacity as       )
Secretary of the United States Department of Labor; and       )
TIMOTHY GEITHNER, in his official capacity as Secretary       )
of the United States Department of Treasury.       )
             *Defendants.*       )

## CERTIFICATION OF SERVICE

The undersigned counsel for Plaintiffs, Charles W. Proctor, III, Esquire, hereby certifies that the following counsel for Defendants were served with the Brief in Support of Motion for Preliminary Injunction proceeding document by placing in the United State Postal Service, on December 8, 2012:

U.S. Dep't. of Health and Human Services    Kathleen Sebelius, in her official
200 Independence Avenue    capacity as Secretary of the
S.W. Washington, DC 20201    U.S. Dep't of Health and Human Services
    200 Independence Avenue
    S.W. Washington, DC 20201

                        */s/ Charles W. Proctor, III*
                   Charles W. Proctor, III, Esquire