**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CONESTOGA WOOD SPECIALITIES** | **:** | **CIVIL ACTION** |
| **CORPORATION, et al.** | **:** | |
| | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **KATHLEEN SEBELIUS, et al.** | **:** | **No. 12-6744** |

**Goldberg, J.**                                                              **January 11, 2013**


**<u>MEMORANDUM OPINION</u>**


This case presents issues of first impression as to whether the Women's Preventive Healthcare regulations under the recently enacted Patient Protection and Affordable Care Act pass muster under the First Amendment and the Religious Freedom Restoration Act of 1993. In resolving these questions we also decide whether the United States Supreme Court's decision in <u>Citizens United v. Federal Election Commission</u>, 130 S. Ct. 876 (2010), which granted political free speech rights to corporations, also extends to the First Amendment's Free Exercise of Religion Clause.

Plaintiffs, Conestoga Wood Specialties Corporation, and five of its owners, Norman Hahn, Elizabeth Hahn, Norman Lemar Hahn, Anthony H. Hahn and Kevin Hahn, brought suit against Kathleen Sebelius in her official capacity as Secretary of the United States Department of Health and

Human Services, along with other United States government officials and agencies,[1] seeking declaratory and injunctive relief.  Plaintiffs allege that various regulations and guidelines implemented in connection with the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, violate the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, et seq., the First and Fifth Amendments to the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 701, et seq.  Specifically, Plaintiffs object to regulations regarding Women's Preventive Healthcare—which Plaintiffs refer to as "the Mandate"— that allegedly "force [them] to pay for and otherwise facilitate the insurance coverage and use of contraception with an abortifacient effect and related education and counseling."  Plaintiffs claim that these regulations conflict with their sincerely-held religious beliefs.  (Am. Compl. ¶¶ 2, 4.)

Plaintiffs filed a motion for preliminary injunction on December 7, 2012, and the Court held an evidentiary hearing on January 4, 2013.[2]  We have also accepted and considered an amicus brief from the American Civil Liberties Union Foundation and the American Civil Liberties Union of Pennsylvania.

For the reasons that follow, we find that Plaintiffs have not shown that they are entitled to a preliminary injunction, and, as such, the motion will be denied.

---

[1] The complete list of Defendants is as follows: Kathleen Sebelius, in her official capacity as Secretary of the United States Department of Health and Human Services; Hilda Solis, in her official capacity as Secretary of the United States Department of Labor; Timothy Geithner, in his official capacity as Secretary of the United States Department of the Treasury; United States Department of Health and Human Services; United States Department of Labor; and United States Department of the Treasury.

[2] On December 28, 2012, we entered an Order for a temporary stay pending an evidentiary hearing.  (Doc. No. 35.)  Absent this temporary stay, Conestoga would have been required to comply with the regulations on January 1, 2013.

I.     **FACTUAL AND PROCEDURAL BACKGROUND**[3]

A.     **The Affordable Care Act**

The Patient Protection and Affordable Care Act ("ACA"), which was signed into law on March 23, 2010, requires employers with fifty or more full-time employees to provide their employees with a minimum level of health insurance.  One aspect of this minimum level of coverage is that employers and health insurance companies are required to cover women's "preventive health services," and are prohibited from imposing cost-sharing for plan beneficiaries.  42 U.S.C. § 300gg-13(a)(4).

The Health Resources and Services Administration ("HRSA") delegated the creation of guidelines on this issue to the Institute of Medicine ("IOM").  See 77 FR 8725-01 (Feb. 15, 2012). On August 1, 2011, the HRSA adopted the recommended guidelines published by the IOM, which included required coverage for "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  INSTITUTE OF MEDICINE, CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS 109-10 (2011) (hereinafter "CLOSING THE GAPS"); see also 76 Fed. Reg. 46621-01 (Aug. 3, 2011).

Under the regulations adopted pursuant to Women's Preventive Healthcare, group health plans and health insurance issuers are required to provide coverage consistent with the HRSA guidelines in plan years beginning on or after August 1, 2012, unless the employer or plan is exempt. *Women's Preventive Services: Required Health Plan Coverage Guidelines*, U.S. DEPT. OF HEALTH AND HUMAN SVCS., http://www.hrsa.gov/womensguidelines/ (last visited Jan. 8, 2013) ("HRSA

_____

[3] All facts are undisputed, unless otherwise noted.

Guidelines"). The interim final regulations and guidelines were adopted without change on April 16, 2012. 77 FR 8725-01 (Feb. 15, 2012).

Congress required coverage of Women's Preventive Healthcare in order to address inequities in the current healthcare system, which leads "women of childbearing age [to] spend 68 percent more in out-of-pocket health care costs than men." 155 Cong. Rec. at S12027 (daily ed. Dec. 1, 2009) (statement of Sen. Gillibrand). Studies have found "more than half of women delay[ ] or avoid[ ] preventive care because of its cost," id. at S12028, and that unplanned pregnancies have a higher rate of health risks for both mother and child than planned pregnancies. CLOSING THE GAPS, supra, at 103.

If an employer fails to comply with these regulations, it faces staunch penalties. Non-exempt employers who choose to exclude health coverage for abortifacient contraception face a penalty of $100 each day per offending employee. 26 U.S.C. § 4980D(b)(1). If an employer fails to provide health insurance altogether, it faces an annual penalty for each employee. See 26 U.S.C. § 4980H. Additionally, the Department of Labor and plan participants may bring suit against an employer that fails to comply with the regulations. 29 U.S.C. § 1132.

The Women's Preventive Healthcare regulations contain numerous exemptions for specific subsets of employers. One such exemption is for "grandfathered" plans—"coverage provided by a group health plan . . . in which an individual was enrolled as of March 23, 2010," the date on which the ACA was enacted. 45 C.F.R. § 147.140(a). An exemption with regard to women's contraception also exists for certain "religious employers." A religious employer is defined as an organization meeting all of the following requirements:

(1) The inculcation of religious values is the purpose of the organization.

4

(2) The organization primarily employs the religious tenets of the organization.

(3) The organization serves primarily persons who share the religious tenets of the organization.

(4) The organization is a nonprofit organization. . . .

45 C.F.R. § 147.130(a)(1)(iv)(B); 77 FR 8725-01 (Feb. 15, 2012).  Finally, employers with fewer than fifty full-time employees are required to provide coverage for Women's Preventative Healthcare within any health plan provided to employees, but are permitted to entirely forego providing insurance without penalty.  26 U.S.C.  § 4980H(c)(2)(A).

Upon receiving feedback from organizations that objected to contraception coverage on religious grounds but also did not fit under the definition of "religious employer," the Department of the Treasury, Department of Labor and Department of Health and Human Services released an advance notice of proposed amendments to the regulations.  77 FR 16501-01 (Mar. 21, 2012).  The agencies gave notice of a safe harbor for certain non-profit organizations that object to the mandatory coverage of contraception.  Under this safe harbor, a qualifying organization would not be subject to penalties for failing to comply with the regulations regarding Women's Preventive Healthcare until the first plan year on or after August 1, 2013.  This respite would allow the agencies time to potentially amend the definition of religious employer.  Id.  The safe harbor applies to organizations meeting all of the following requirements:

(1) The organization is organized and operates as a non-profit entity.

(2) From February 10, 2012 onward, contraceptive coverage has not been provided at any point by the group health plan established or maintained by the organization, consistent with any applicable State law, because of the religious beliefs of the organization.

(3) . . . [T]he group health plan established or maintained by the organization . . . must provide to participants [a]n attached notice . . . which states that contraceptive

5

coverage will not be provided. . . .

(4) The organization self-certifies that it satisfies criteria 1-3 above. . . .

*Guidance on the Temporary Enforcement Safe Harbor for Certain Employers*, CTR. FOR CONSUMER

INFO. & INS. OVERSIGHT & CTRS. FOR MEDICARE & MEDICAID SVCS. (Feb. 10, 2012),

http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf.

### B.    The Plaintiffs

Plaintiff, Conestoga Wood Specialties Corporation ("Conestoga"), is a closely-held, for-profit

Pennsylvania corporation that manufactures wood cabinets and wood specialty products.  It is owned

and operated by Plaintiffs Norman Hahn, Elizabeth Hahn, Norman Lemar Hahn, Anthony H. Hahn,

and Kevin Hahn ("the Hahns"), the founder of Conestoga, his wife and their sons, respectively.[4]  In

addition to being shareholders, the Hahns maintain various positions on the board of directors, and

Plaintiff Anthony H. Hahn serves as President and Chief Executive Officer of Conestoga.   The

corporation presently employs approximately 950 full-time employees.  (Am. Compl. ¶¶ 11-16, 37.)

The Hahns are practicing Mennonite Christians whose faith requires them to operate

Conestoga in accordance with their religious beliefs and moral principles.   (Id. at ¶¶ 2, 27.)

Conestoga's mission statement includes the following language: "We operate in a professional

environment founded upon the highest ethical, moral, and Christian principles reflecting respect,

support, and trust for our customers, our suppliers, our employees and their families."  (Pls.' Br., Ex.

1.)  Both Conestoga and the Hahns make annual contributions to various charities and community

organizations in accordance with the Hahns' religious beliefs.  (Am. Compl. ¶ 35.)  Further, on

---

[4] These five members of the Hahn family possess 100% of the voting shares of Conestoga's stock.  Additional, non-voting shares are held by other members of the Hahn family.  (Hrg. Tr., Jan. 4, 2013, pp. 11, 19.)

October 31, 2012, the board of directors adopted "The Hahn Family Statement on the Sanctity of Human Life."[5]  (Pls.' Br., Ex. 5.)  Conestoga's Articles of Incorporation are silent as to any religious purpose or belief.  (Defs.' Br., Ex. 1.)

Conestoga provides employees with a health insurance plan that covers a number of women's preventive health expenses, such as pregnancy-related care, routine gynecological care and testing for sexually transmitted diseases.  (Am. Compl. ¶ 84.)  However, Conestoga's health plan specifically excludes coverage for "contraceptive prescription drugs" and "[a]ny drugs used to abort a pregnancy." (Pls.' Br., Ex. 6.)

"The Mennonite Church teaches that taking of life which includes anything that terminates a fertilized embryo is an intrinsic evil and a sin against God."  (Am. Compl. ¶ 30.)  Therefore, the Hahns believe it would be sinful for them to pay for, or contribute in any way to, the use of abortifacient contraception, which they define as, any drug or device that may "terminate[ ] a fertilized embryo."  (Id. at ¶¶ 30, 32.)  The Hahns specifically object to prescription plan coverage of

---

[5] This statement provides that:

"The Hahn family has always believed that the Bible is the inspired, infallible, and authoritative written word of God, the one and only eternal God.

Found in the Bible, Exodus 20:13 (NIV) as one of the 'Ten Commandments[,]' God commands, 'You shall not murder[.]'

Found in the Bible, Psalms 139:13-16 (NIV), the writer acknowledges God in how he was made and says[,] 'For you created my inmost being; you knit me together in my mother's womb. I praise you because I am fearfully and wonderfully made; your works are wonderful, I know that full well.  My frame was not hidden from you when I was made in the secret place, when I was woven together in the depths of the earth.  Your eyes saw my unformed body; all the days ordained for me were written in your book before one of them came to be.'

The Hahn Family believes that human life begins at conception (at the point where an egg and sperm unite) and that it is a sacred gift from God and only God has the right to terminate human life.  Therefore it is against our moral conviction to be involved in the termination of human life through abortion, suicide, euthanasia, murder, or any other acts that involve the deliberate taking of human life."

7

"Plan B," commonly known as the "morning after pill," and "Ella," also known as the "week after pill."[6]  (Id. at ¶¶ 45-46.)

As a for-profit corporation, Conestoga does not fit into an exemption for religious employers, nor does it fall under the safe harbor.  Additionally, Conestoga's health plan does not qualify as a grandfathered plan under 26 C.F.R. § 54.9815-1251T.  Therefore, Plaintiffs are currently left to choose between providing coverage to employees for abortifacient contraception, which they contend violates their right to religious freedom, or pay significant financial penalties.  Confronted with this choice, Plaintiffs filed the instant motion for preliminary injunction.

## II.    STANDARD OF REVIEW

"Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'"  Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (quoting American Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994)). In order for a court to grant a motion for preliminary injunction, the moving party must demonstrate: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."  Id. at 708.  "The injunction shall issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief."  N.J. Hosp. Ass'n v. Waldman, 73 F.3d 509, 512 (3d Cir. 1995) (citing American Tel & Tel Co., 42 F.3d at 1427).

In demonstrating the likelihood of success on the merits, a plaintiff need not show that it is

---

[6] We note that Defendants do not agree that Plan B or Ella can cause the termination of a fertilized egg.  However, Defendants agree that it is Plaintiffs' belief that these drugs can have an abortifacient effect.  (Hrg. Tr., Jan. 4, 2013, p. 69.)

more likely than not that he will succeed.  Singer Mgmt. Consultants, Inc. v. Milgram, 650 F.3d 223, 229 (3d Cir. 2011).  Instead, a plaintiff must "show[ ] a reasonable probability of success on the merits."  American Express Travel Related Svcs., Inc. v. Sidamon-Eristoff, 669 F.3d 359, 366 (3d Cir. 2012).

We note that other courts that have decided cases with similar facts and ruled in favor of injunctive relief have generally applied a less rigorous standard.  For example, in Tyndale House Publishers, Inc. v. Sebelius, 2012 WL 5817323 (D.D.C. Nov. 16, 2012), when evaluating the preliminary injunction factors, the district court applied a "sliding scale approach," whereby an unusually strong showing of one factor lessens a plaintiff's burden in demonstrating a different factor.  Id. at *4; see also Korte v. Sebelius, 2012 WL 6757353, at *2 (7th Cir. Dec. 28, 2012) ("[w]e evaluate a motion for an injunction pending appeal using the . . . 'sliding scale' approach"); Sharpe Holdings, Inc. v. U.S. Dept. of Health & Human Svcs., 2012 WL 6738489, at *4 (E.D. Mo. Dec. 31, 2012) ("[i]n balancing the equities no single factor is determinative") (quoting Dataphase Sys., Inc. v. CL Sys. Inc., 640 F.2d 109, 113 (8th Cir. 1981)); Monaghan v. Sebelius, 2012 WL 6738476, at *3 (E.D. Mich. Dec. 30, 2012) (same); American Pulverizer Co. v. U.S. Dept. of Health & Human Svcs., No. 12-3459-CV-S-RED, slip op. at 4 (W.D. Mo. Dec. 20, 2012) (same); Legatus v. Sebelius, 2012 WL 5359630, at *3 (E.D. Mich. Oct. 31, 2012) (same).  The United States Court of Appeals for the Third Circuit, however, has no such "sliding scale" standard, and Plaintiffs must show that all four factors favor preliminary relief.  Pitt News v. Fisher, 215 F.3d 354, 365-66 (3d Cir. 2000).

## III.   DISCUSSION

### A.   Article III Standing

As a preliminary matter, we must determine whether a "case or controversy" exists, such that

this Court has jurisdiction under Article III.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  A plaintiff bears the burden of demonstrating that he has Article III standing.  ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 301 (3d Cir. 2012).  To satisfy this burden, a plaintiff must show:

> (1) that he is under a threat of suffering an injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable judicial decision will prevent or redress the injury.

Id. (citing Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009)) (internal quotation marks omitted).

Defendants assert that Plaintiffs have not satisfied the standing requirement because "[P]laintiffs cannot show that any injury purportedly caused by the preventive services coverage regulations is fairly traceable to [D]efendants, as opposed to the result of [P]laintiffs' own independent choices." (Defs.' Br., pp. 9-10.)   Specifically, Defendants argue that Conestoga's health insurance plan would have been exempt from the regulations as a grandfathered plan, but that Plaintiffs failed to follow the requirements of 26 C.F.R. § 54.9815-1251T.  Therefore, Defendants urge that any injury is self-inflicted, and does not satisfy the requirements for Article III standing. We disagree.

Under the second prong of the test for standing, Plaintiffs must demonstrate that the injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Ariz. Christian Sch. Tuition Org. v. Winn, 131 S. Ct. 1436, 1442 (2011) (alteration in original) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)) (internal quotation marks omitted).  Although Plaintiffs admit that Conestoga could have qualified for grandfathered status if it had maintained the same plan as that provided in

10

previous years, (Hrg. Tr., Jan. 4, 2013, pp. 61-62), Defendants acknowledge that "grandfathering is not really a permanent 'exemption,' but rather, over the long term, a transition in the marketplace with respect to . . . the preventive services coverage provision." (Defs.' Resp., p. 26.) Thus, it cannot be said that Defendants play no role in the alleged injury to the Plaintiffs, since, according to Defendants, Conestoga would be subject to the regulations eventually, even if it initially qualified for grandfathered status. As such, we are satisfied that Plaintiffs have demonstrated Article III standing.

### B.    Likelihood of Success on the Merits

We are mindful that this case is one of many filed against the government in recent months by secular, for-profit corporations and their owners regarding the Women's Preventive Healthcare regulations. These lawsuits, most of which have sought preliminary injunctions, present complicated issues of first impression, such as whether a corporation has free exercise protections under the First Amendment of the Constitution, and whether the Women's Preventive Healthcare regulations create a "substantial burden" on Plaintiffs' exercise of religion under the Religious Freedom Restoration Act ("RFRA"). Not surprisingly, courts who have considered these issues have reached different outcomes.[7]

---

[7] Compare Korte v. Sebelius, 2012 WL 6757353 (7th Cir. Dec. 28, 2012) (granting injunction pending appeal), O'Brien v. U.S. Dept. of Health & Human Svcs., No. 12-3357 (8th Cir. Nov. 28, 2012) (granting "[a]ppellants' motion for stay pending appeal," without further comment), Sharpe Holdings, Inc. v. U.S. Dept. of Health & Human Svcs., 2012 WL 6738489 (E.D. Mo. Dec. 31, 2012) (granting motion for temporary restraining order), Monaghan v. Sebelius, 2012 WL 6738476 (E.D. Mich. Dec. 30, 2012) (same), American Pulverizer Co. v. U.S. Dept. of Health & Human Svcs., No. 12-3459-CV-S-RED, slip op. (W.D. Mo. Dec. 20, 2012) (granting preliminary injunction), Tyndale House Publishers, Inc. v. Sebelius, 2012 WL 5817323 (D.D.C. Nov. 16, 2012) (same), Legatus v. Sebelius, 2012 WL 5359630 (E.D. Mich. Oct. 31, 2012) (same), and Newland v. Sebelius, 2012 WL 3069154 (D. Colo. July 27, 2012) (same), with Autocam Corp. v. Sebelius, No. 12-2673, slip op. (6th Cir. Dec. 28, 2012) (denying preliminary injunction pending appeal), Hobby Lobby Stores, Inc.

In their motion, Plaintiffs argue the merits of their claims under the First Amendment and the RFRA.  We will address each of these claims in turn.

      1.     <u>The Free Exercise Clause of the First Amendment</u>

The Free Exercise Clause of the First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. CONST. amend. I.  Plaintiffs argue that the operation of Conestoga in accordance with the Hahns' religious beliefs constitutes the "exercise of religion" under the Free Exercise Clause, and that being forced to provide coverage for all FDA-approved contraception substantially burdens their religious beliefs.

In resolving this issue, we must, as a threshold matter, determine whether Plaintiffs have "free exercise" rights under the First Amendment.  The Hahns certainly possess these rights.  We conclude, however, that Conestoga, as a for-profit, secular corporation, does not.

      i.     Conestoga's Free Exercise Rights

Neither the Supreme Court nor the Third Circuit have had occasion to decide whether for-profit, secular corporations possess the religious rights held by individuals.  Certainly, a number of constitutional freedoms have been extended to corporations.  <u>See</u> <u>e.g.</u>, <u>Citizens United v. Fed. Election Comm'n</u>, 130 S. Ct. 876, 913 (2010) ("the Government may not suppress political speech on the basis of the speaker's corporate identity"); <u>United States v. Martin Linen Supply Co.</u>, 430 U.S. 564 (1977) (applying the Fifth Amendment's double jeopardy protections to a corporation); <u>G.M. Leasing Corp. v. United States</u>, 429 U.S. 338 (1977) (extending Fourth Amendment search and seizure protections to a corporation).  However, there are certain "purely personal" guarantees that

---

<u>v. Sebelius</u>, No. 12-6294, slip op. (10th Cir. Dec. 20, 2012) (same), and <u>Grote Indus., LLC v. Sebelius</u>, 2012 WL 6725905 (S.D. Ind. Dec. 27, 2012) (denying motion for preliminary injunction).

are unavailable to corporations.  First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 778, n.14 (1978) (citing United States v. White, 322 U.S. 694, 698-701 (1944)); see also Wilson v. United States, 221 U.S. 361, 382-86 (finding that the privilege against self-incrimination does not apply to corporations); Cal. Bankers Ass'n v. Schultz, 416 U.S. 21, 65-67 (1974) (declining to extend to a corporation the right to privacy to the same extent as individuals).  "Whether or not a particular guarantee is 'purely personal' or is unavailable to corporations for some other reason depends on the nature, history, and purpose of the particular constitutional provision."  Bellotti, 435 U.S. at 778, n.14.

Plaintiffs cite to Citizens United v. Federal Election Commission, 130 S. Ct. 876 (2010), for the proposition that a secular, for-profit corporation has free exercise rights under the Constitution.  In Citizens United, the Supreme Court held a provision of the Bipartisan Campaign Reform Act of 2002 unconstitutional because it impeded corporations' abilities to engage in political discourse in violation of the Free Speech Clause of the First Amendment.  Id. at 917.  In reaching its decision, the Court focused on the history and purpose of free speech rights, particularly political speech, noting that "[t]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office."  Id. at 898 (quoting Eu v. San Francisco Cnty. Democratic Central Comm., 489 U.S. 214, 223 (1989)) (quotation marks omitted).  Citizens United built upon the long-accepted principle that corporations have free speech rights protected by the Constitution.  See id. at 899-900 (citing numerous cases that found corporations to have free speech rights under the First Amendment).  However, we find no such historical support for the proposition that a secular, for-profit corporation possesses the right to free exercise of religion.

Plaintiffs urge that the rights to free speech and free exercise of religion are inseparable, and

13

thus Citizens United must extend to the Free Exercise Clause.  (Hrg. Tr., Jan. 4, 2013, p. 27.)  This argument assumes too much.  Although they reside within the same constitutional amendment, these two provisions have vastly different purposes and precedents, and we decline to make the significant leap Plaintiffs ask of us without clear guidance from Congress or the Supreme Court.[8]

Plaintiffs also urge this Court to find that Conestoga has free exercise rights by citing to cases in which religious organizations were granted free exercise protections.   While religious organizations, as a means by which individuals practice religion, have been afforded free exercise rights, see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 132 S. Ct. 694, 706 (2012) ("the text of the First Amendment . . . gives special solicitude to the rights of religious organizations"); see also Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal, 546 U.S. 418 (2006); Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993), courts have consistently limited such holdings to religious organizations.[9]  We find the distinction between religious organizations and secular corporations to be meaningful, and decline to act as though this

_____

[8] We recognize that a number of courts that have considered this issue have cited Citizens United for the proposition that secular corporations may have free exercise rights.  See Korte v. Sebelius, 2012 WL 6757353, at *3;  Legatus, 2012 WL 5359630, at *4.  However, these courts provided little explanation for their findings, and we disagree for the reasons stated supra.

[9] In determining whether an organization constitutes a "religious organization," courts weigh the following factors: "(1) whether the entity operates for a profit[;] (2) whether it produces a secular product[;] (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose[;] (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue[;] (5) whether a formally religious entity participates in the management . . . [;] (6) whether the entity holds itself out to the public as secular or sectarian[;] (7) whether the entity regularly includes prayer or other forms of worship in its activities[;] (8) whether it includes religious instruction in its curriculum . . . [;] and whether its membership is made up by coreligionists."  LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 226 (3d Cir. 2007).
Conestoga, as a for-profit company, creating a secular product, with no formal ties to a church or other religious group, clearly does not meet the definition of a religious organization.

14

difference does not exist.

The purpose of the Free Exercise Clause is "to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority." Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 223 (1963) (emphasis added).  Religious belief takes shape within the minds and hearts of individuals, and its protection is one of the more uniquely "human" rights provided by the Constitution.  As recognized in Hobby Lobby Stores, Inc. v. Sebelius, 870 F. Supp. 2d 1278 (W.D. Okla. 2012), "[g]eneral business corporations . . . do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors."  Id. at 1291.  Therefore, we conclude that the nature, history and purpose of the Free Exercise Clause demonstrate that it is one of the "purely personal" rights referred to in Bellotti, and as such, is unavailable to a secular, for-profit corporation.

Alternatively, Plaintiffs argue that, as a closely-held corporation, with shareholders who all practice  the Mennonite faith, Conestoga may act as the Hahns' "alter-ego," and thus assert the Hahns' religious rights on their behalf.  Plaintiffs cite to Tyndale House Publishers, Inc. v. Sebelius, 2012 WL 5817323 (D.D.C. Nov. 16, 2012), a case in which the plaintiffs also challenged the ACA Women's Preventive Healthcare regulations, for support.  Tyndale held that where the beliefs of a closely-held corporation and its owners are indistinguishable, "united by their [ ] faith . . . [and] shared, religious objectives[,]" the corporation has standing to assert the free exercise rights of its owners.  Id. at *7.  Tyndale largely relied upon two cases from the United States Court of Appeals for the Ninth Circuit in reaching this conclusion: Stormans, Inc. v. Selecky, 586 F.3d 1109 (9th Cir.

2009) and  <u>EEOC v. Townley Engineering and Manufacturing Co.</u>, 859 F.2d 610 (9th Cir. 1988).[10]

In <u>Stormans</u> and <u>Townley</u>, the Ninth Circuit held that a closely-held corporation that "does not present any free exercise rights of its own different from or greater than its owners' rights . . . has standing to assert the free exercise rights of its owners." <u>Stormans</u>, 586 F.3d at 1120; <u>see</u> <u>also</u> <u>Townley</u>, 859 F.2d at 619-20.  We are not persuaded by this line of reasoning.

"[I]ncorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 163 (2001).  "Even when a corporation is owned by one person or a family, the corporate form shields the individual members of the corporation from personal liability." <u>Kelleytown Co. v. Williams</u>, 426 A.2d 663, 668 (Pa. Super. Ct. 1981).  It would be entirely inconsistent to allow the Hahns to enjoy the benefits of incorporation, while simultaneously piercing the corporate veil for the limited purpose of challenging these regulations.  We agree with the <u>Autocam</u> court, which stated that this separation between a corporation and its owners "at a minimum [ ] means the corporation is not the *alter ego* of its owners for purposes of religious belief and exercise."[11] <u>Autocam Corp. v. Sebelius</u>, No. 1:12-

---

[10] Plaintiffs also cite to <u>Legatus v. Sebelius</u>, 2012 WL 5359630, at *4 (E.D. Mich. Oct. 31, 2012), in which the court found "a strong case for standing, at least on a <u>Stormans</u> pass-through instrumentality theory."  For the sake of simplicity, we will focus on the <u>Tyndale</u> decision in our analysis.

[11] We further note that the facts in the present case are distinguishable from the facts in <u>Tyndale</u>.  The <u>Tyndale</u> court relied on the plaintiff's unique corporate structure in reaching its decision. Tyndale House Publishers, Inc. is a Christian, faith-based book publisher that holds weekly chapel service for its employees and is 96.5% owned by a religious non-profit organization. Tyndale's Articles of Incorporation make numerous references to the corporation's religious purpose and its board members and trustees are required to sign a statement of faith each year, demonstrating their religious convictions.  <u>Tyndale</u>, 2012 WL 5817323, at *6-7.

(continued...)

cv-1096, slip op. at 12 (W.D. Mich. Dec. 24, 2012) (emphasis in original).

Accordingly, we conclude that Conestoga cannot assert free exercise rights under the First Amendment, and therefore, cannot demonstrate a likelihood of success on the merits for a free exercise claim.

ii.      Hahns' Free Exercise Rights

Next, we must assess the Hahns' likelihood of success on their free exercise claim.  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532 (1993). Where a law is found to violate the Free Exercise Clause, "it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest."  Id. at 533.

The Free Exercise Clause is not, however, violated by a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that [a plaintiff's] religion prescribes (or proscribes)."  Emp't Div., Dept. of Human Res. of Or. v. Smith, 494 U.S. 872, 879 (1990) (quoting United States v. Lee, 455 U.S. 252, 263, n.3 (1982)).  A neutral law of general applicability need only be "rationally related to a legitimate government objective" to be upheld. Combs v. Homer-Ctr. Sch. Dist., 540 F.3d 231, 243 (3d Cir. 2008) (quoting Tenafly Eruv Ass'n, Inc. v. Tenafly, 309 F.3d 144, 165, n. 24 (3d Cir. 2002)).

Plaintiffs first argue that the regulations are not generally applicable because they are

---

[11](...continued)
Conestoga, on the other hand, has none of these characteristics.  We do not doubt that the Hahns' religious convictions have influenced the manner in which they operate Conestoga.  (See Exs. 1-5.)  However, the substantial overlap of faith and business found in Tyndale is simply not present here.

underinclusive.  Specifically, Plaintiffs point to the exemptions for grandfathered plans, small employers who may forego providing insurance without penalty and religious employers.  A regulation is not generally applicable "if it is enforced against a category of religiously motivated conduct, but not against a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated."  McTernan v. City of York, 564 F.3d 636, 648 (3d Cir. 2009) (internal citations omitted).  The Women's Preventive Healthcare regulations, however, apply to all health plans "not falling under an exemption, regardless of those employers' personal religious inclinations."  O'Brien v. U.S. Dept. of Health & Human Svcs., 2012 WL 4481208, at *8 (E.D. Mo. Sept. 28, 2012).  They are not specifically targeted at conduct motivated by religious belief.

Plaintiffs also argue that the Women's Preventive Healthcare regulations are not neutral because they exclude some religious employers but not others.  "A law is 'neutral' if it does not target religiously motivated conduct either on its face or as applied in practice."  Blackhawk v. Pennsylvania, 381 F.3d 202, 209 (3d Cir. 2004).  The fact that exemptions were made for religious employers does not indicate that the regulations seek to burden religion.  Instead, it shows that the government made efforts to accommodate religious beliefs, which counsels in favor of the regulations' neutrality.  See O'Brien, 2012 WL 4481208, at *8 ("the religious employer exemption presents a strong argument in favor of neutrality").  It is clear from the history of the regulations and the report published by the Institute of Medicine that the purpose of the Women's Preventive Healthcare regulations is not to target religion, but instead to promote public health and gender equality, and Plaintiffs have not presented any evidence to the contrary.  See Hobby Lobby, 870 F. Supp. 2d at 1289-90; O'Brien, 2012 WL 4481208, at *7.

18

As Defendants can clearly demonstrate that the regulations are "rationally related to a legitimate government objective," the regulations do not offend the Free Exercise Clause. Consequently, Plaintiffs have failed to show a likelihood of success on the merits of their free exercise claim.

>   2.   The Religious Freedom Restoration Act

The Religious Freedom Restoration Act ("RFRA") states that, "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government can demonstrate that "the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.[12] The plaintiff has the burden of establishing the elements of a prima facie case: that application of the offensive law or policy would substantially burden a sincere, religious exercise. See Norwood v. Strada, 249 Fed. Appx. 269, 271 (3d Cir. 2007). Once a prima facie case has been satisfied, the government bears the burden of demonstrating a compelling interest and that the government employed the least restrictive means in carrying out that interest. Adams v. Comm'r of Internal Revenue, 170 F.3d 173, 176 (3d Cir. 1999); see also Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal, 546 U.S. 418, 428-29 (2006) (under the RFRA, "the burdens at the preliminary injunction stage track the burdens at trial").

---

[12] The Supreme Court has held that the RFRA exceeds Congress's power under Section 5 of the Fourteenth Amendment, and is therefore unconstitutional as applied to the states. City of Boerne v. Flores, 521 U.S. 507 (1997). Although the Third Circuit has never explicitly decided whether the RFRA is constitutional as applied to the federal government, the parties do not contest the constitutionality or applicability of the RFRA in this case. Therefore, we "assume without deciding that [the] RFRA is constitutional as applied to the federal government." Norwood v. Strada, 249 Fed. Appx. 269, 271, n. 3 (3d Cir. 2007) (quoting Adams v. Comm'r of Internal Revenue, 170 F.3d 173, 175 (3d Cir. 1999)).

Plaintiffs argue that the operation of Conestoga in accordance with the Hahns' religious beliefs constitutes the "exercise of religion" under the RFRA, and that the Women's Preventative Healthcare regulations impose a substantial burden upon their religion because "it directly mandates that they violate th[eir] beliefs." (Pls.' Br., p. 9.)  Additionally, Plaintiffs argue that Supreme Court precedent dictates that we consider only the amount of pressure applied by the government, and not interpret the confines of religious doctrine.  (Id. at pp. 12-14.)

Defendants do not contest that the Hahns' beliefs are sincerely held or religious in nature. However, Defendants strongly assert that Conestoga cannot exercise religion within the meaning of the RFRA, and that the Women's Preventative Healthcare regulations do not pose a substantial burden upon the Hahns' beliefs because: (1) the regulations apply to Conestoga, not the Hahns; and (2) any burden imposed by the regulations is too attenuated to constitute a substantial burden. (Defs.' Br., pp. 11-22.)

i.       Conestoga's Rights Under the RFRA

For the reasons stated supra, we agree with Defendants that Conestoga cannot exercise religion within the meaning of the RFRA.

Nonetheless, Plaintiffs persist that Conestoga is a "person" under the RFRA because the general definition of "person" found in 1 U.S.C. § 1 states, "[I]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' includes corporations."  As we have determined that a for-profit, secular corporation cannot exercise religion, this would certainly be a situation where the "context indicates otherwise."  Therefore, Conestoga cannot bring a claim under the RFRA.

We must next consider whether the Hahns have demonstrated that the regulations would

20

substantially burden their religious exercise.

      ii.    Substantial Burden

The Supreme Court has not considered the issue of what constitutes a substantial burden in a case involving the Women's Preventive Healthcare regulations.  See Hobby Lobby Stores, Inc. v. Sebelius, 133 S. Ct. 641, 643 (2012) (Sotomayor, J.) (noting that the Supreme Court has not considered the RFRA or free exercise claims brought by a closely-held, for-profit corporation and shareholders alleging that regulations substantially burdened their exercise of religion).  However, in considering a free exercise of religion challenge in a different context,[13] the Supreme Court has observed:

> Where the state conditions the receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by a religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.  While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 717-18 (1982).

In articulating the guidelines for when religious freedoms may be infringed, the Supreme Court has also cautioned that: "every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs.  When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity."  United States v. Lee, 455 U.S. 252, 261 (1982).

---

[13] When conducting an analysis under the RFRA, courts generally look to free exercise cases decided prior to Employment Div., Dept. of Human Resources of Or. v. Smith, 494 U.S. 872 (1990), for guidance, since those earlier cases employ the same standard as that codified by Congress in the RFRA.  See Adams v. Comm'r of Internal Revenue, 170 F.3d 173, 175-79 (3d Cir. 1999).

Neither has the Third Circuit applied the "substantial burden" standard to the Women's Preventive Healthcare regulations.  Nevertheless, in examining the RFRA as applied to a different statute, the Third Circuit has stated:

> The RFRA does not explain what constitutes a "substantial burden" on the exercise of religion. We have stated, however, that within the related context of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), a "substantial burden" "exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR [sic] 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs."

Norwood v. Strada, 249 Fed. Appx. 269, 271 (3d Cir. 2007) (quoting Washington v. Klem, 497 F.3d 272, 280 (3d Cir. 2007)) (quotation marks omitted).

With this general precedential background from the Supreme Court and the Third Circuit in mind, we note that the flurry of opinions recently issued in similar cases have all directly considered the "substantial burden" test as applied to the Women's Preventive Healthcare regulations.  We concur with the district court in the Western District of Oklahoma, which observed that, "[t]he present circumstances require charting a course through the 'treacherous terrain' at the intersection of the federal government's duty to avoid imposing burdens on the individual's practice of religion and the protection of competing interests."  Hobby Lobby Stores, Inc. v. Sebelius, 870 F. Supp. 2d 1278, 1293 (W.D. Okla. 2012).  That said, we believe that two opinions best explain and contrast the differing views on this issue.

In Tyndale House Publishers, Inc. v. Sebelius, 2012 WL 5817323 (D.D.C. Nov. 16, 2012), the district court granted a preliminary injunction, finding that the contraceptive coverage mandate substantially burdened the plaintiffs' religious exercise.  In so holding, the court focused on the

financial pressure that the plaintiffs faced if they chose not to comply with the Women's Preventive Healthcare regulations.  Id. at *12.  The court concluded that this scenario creates a "Hobson's choice," and "amply shows that the contraceptive coverage mandate substantially burdens the plaintiffs' religious exercise."  Id.  In conducting its analysis, the Tyndale court primarily relied on three cases.  See Wisconsin v. Yoder, 406 U.S. 205, 218-19 (1972) (mandatory school attendance law substantially burdens Amish faith); Sherbert v. Verner, 374 U.S. 398, 404 (1963) (substantial burden to deny unemployment benefits to a worker fired for not working on her Sabbath); Thomas v. Anchorage Equal Rights Comm'n, 165 F.3d 692, 714 (9th Cir. 1999) rev'd on other grounds en banc, 220 F.3d 1134 (9th Cir. 2000) (law prohibiting discrimination in housing based on marital status substantially burdened landlord's religion).

Reaching a different result than Tyndale, the district court in Hobby Lobby, ruled that the plaintiffs could not establish that the regulations created a substantial burden.  870 F. Supp. 2d at 1294-96.  While recognizing that it is not within a court's province to question a plaintiff's religious beliefs, the court emphasized that this precept does not mean that any burden on religion is prohibited.  Id. at 1293.  Rather, the court stressed that the burden imposed by the law must be substantial in order to violate the RFRA.  Id.  The Hobby Lobby court ultimately concluded that the burden in question was too attenuated to be substantial.  Id. at 1294.

Only a few weeks ago, the United States Court of Appeals for the Tenth Circuit affirmed the district court's reasoning in Hobby Lobby, agreeing that the plaintiffs could not establish a substantial burden.  The Tenth Circuit quoted the following statement by the district court with approval:

> [T]he particular burden of which plaintiffs complain is that funds, which plaintiffs
> will contribute to a group health plan, might, after a series of independent decisions

> by health care providers and patients covered by [the corporate] plan, subsidize *someone else's* participation in an activity that is condemned by plaintiff[s'] religion. Such an indirect and attenuated relationship appears unlikely to establish the necessary "substantial burden."

Hobby Lobby Stores, Inc. v. Sebelius, No. 12-6294, slip op. at 7 (10th Cir. Dec. 20, 2012) (quoting Hobby Lobby, 870 F. Supp. 2d at 1294) (emphasis in original).  The Tenth Circuit went on to stress that "other cases enforcing [the] RFRA have done so to protect a plaintiff's own participation in (or abstention from) a specific practice required (or condemned) by his religion."  Id.  The court concluded that the reach of the RFRA does not "encompass the independent conduct of third parties with whom the plaintiffs have only a commercial relationship."  Id.

While we view the "substantial burden" issue to be a closer call than whether Conestoga, acting as a corporation, can exercise religious rights, for the reasons that follow, we agree with the reasoning expressed in the Hobby Lobby opinions, and find that the Hahns have not demonstrated that these regulations constitute a substantial burden upon their religion.

First, we reject the notion expressed in Legatus v. Sebelius, 2012 WL 5359630 (E.D. Mich. Oct. 31, 2012), that a plaintiff shows a burden to be substantial simply by claiming that it is.  Id. at *6 (citing United States v. Lee, 455 U.S. 252, 257 (1982); May v. Baldwin, 109 F.3d 557, 563 (9th Cir. 1997) (where the court assumed that undoing dreadlocks imposed a substantial burden on plaintiff's exercise of religion)).  While we wholeheartedly agree that "courts are not the arbiters of scriptural interpretation," Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 718 (1981), the RFRA still requires the court to determine whether the burden a law imposes on a plaintiff's stated religious belief is "substantial."  Essentially, the Legatus court bypassed a careful examination of whether an objector's stated burden was in fact substantial, and concluded that the substantial

burden test could be met simply because the objector proclaimed such a burden existed.  This reasoning presents a very slippery slope upon which we are not prepared to descend.[14]

If every plaintiff were permitted to unilaterally determine that a law burdened their religious beliefs, and courts were required to assume that such burden was substantial, simply because the plaintiff claimed that it was the case, then the standard expressed by Congress under the RFRA would convert to an "any burden" standard.  See Washington v. Klem, 497 F.3d 272, 279-81 (3d Cir. 2007) (arguing that finding a substantial burden whenever a government program has "any incidental effect" on religious beliefs would "read 'substantial' out of the statute").  Aside from being contrary to the plain language of the RFRA, this type of blind application would permit any religious objector to refuse to comply with Congressional mandates based solely on stated religious objections, which could include laws dealing with public and workplace safety, and discrimination.  See Autocam Corp v. Sebelius, No. 1:12-cv-1096, slip op. at 12-13 (W.D. Mich. Dec. 24, 2012) (opining that, if a court cannot look beyond a plaintiff's sincerely held assertion of religious based objections to determine whether the regulations impose a substantial burden, every governmental regulation would be susceptible to a "private veto").

As noted previously, the Supreme Court in Lee recognized that free exercise protections are not absolute, and that, while religious beliefs are to be accommodated, "there is a point at which accommodations would 'radically restrict the operating latitude of the legislature.'" Lee, 455 U.S. at 260 (quoting Braunfeld v. Brown, 366 U.S. 599, 605 (1961)).  The Hahns, in operating Conestoga,

---

[14] The term "slippery slope," a commonly used legal phrase, means "a course of action that seems to lead inevitably from one action or result to another with unintended consequences." MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/slippery%20slope (last visited Jan. 9, 2013).  This definition aptly describes what would occur were we to follow the reasoning in Legatus.

understood that a commercial enterprise would be subject to numerous laws regulating commerce. We agree with the district court in <u>Hobby Lobby</u> that, for those laws or regulations to violate the RFRA, "there must be more than some burden on religious exercise.  The burden must be substantial."  <u>Hobby Lobby</u>, 870 F. Supp. at 1295.

With these principles in mind, we turn to the question of how the Women's Preventive Healthcare regulations burden the religious belief articulated by the Hahns.  At the preliminary injunction hearing, Plaintiffs' counsel emphasized that the heart of Plaintiffs' objections are focused on the use of abortifacient contraceptives that can affect a fertilized egg.  Counsel stated:

> Because many of these drugs not only have some medical effect on the egg, but they also affect the lining of a woman's uterus and thus interfere with the implantation of the egg, our concern and our clients' deeply held religious concern, is that any fertilized egg that's prevented from implanting, that's aborted the morning after or a week after, any interruption of a woman's lining of her uterus, any drug that would do that, that would be involved in that, <u>is what they are most sincerely and deeply opposed to</u>.

(Hrg. Tr., Jan. 4, 2013, pp. 67-68) (emphasis added).  As this statement reflects, the core of the Hahns' religious objection is the effect of particular contraceptives on a fertilized egg.  Given that focus, it is worth emphasizing that the ultimate and deeply private choice to use an abortifacient contraceptive rests not with the Hahns, but with Conestoga's employees.  The fact that Conestoga's employees are free to look outside of their insurance coverage and pay for and use any contraception, including abortifacients, through the salary they receive from Conestoga, amply illustrates this point. <u>Autocam</u>, No. 1:12-cv-1096, slip op. at 11 (noting that plaintiffs will be "paying indirectly for the same services through wages" that their employees may choose to use "for contraception products and services").

We also find that any burden imposed by the regulations is too attenuated to be considered

substantial.  A series of events must first occur before the actual use of an abortifacient would come into play.  These events include: the payment for insurance to a group health insurance plan that will cover contraceptive services (and a wide range of other health care services); the abortifacients must be made available to Conestoga employees through a pharmacy or other healthcare facility; and a decision must be made by a Conestoga employee and her doctor, who may or may not choose to avail themselves to these services.

The indirect nature of the burden[15] imposed by the Women's Preventive Healthcare regulations also distinguishes this case from the precedent relied upon by the <u>Tyndale</u> court.[16]  For example, in <u>Yoder</u>, the Amish plaintiffs were threatened with prosecution for their refusal to send their children to school in violation of their religious beliefs.  406 U.S. at 218.  In <u>Sherbert</u>, the government denied the plaintiff's unemployment benefits because she had been fired for refusing to work on her Sabbath.  374 U.S. at 403-04.  In <u>Thomas</u>, the plaintiffs were forced to comply with a housing mandate based on marital status.  615 F.3d at 1137-38.  And, in <u>Gonzales</u>, a case mentioned only briefly in <u>Tyndale</u>, but heavily relied upon by Plaintiffs, prosecution was threatened where members of a church received communion through the drinking of tea that contained a

---

[15] Relying on the Supreme Court's statement in <u>Thomas v. Review Bd. of Ind. Emp't Sec. Div.</u>, that "[w]hile the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial," 450 U.S. 707, 718 (1982), Plaintiffs strongly assert that the indirect nature of the burden is not fatal to their claim.  However, Plaintiffs' misunderstand the principle asserted in <u>Thomas</u>.  While a <u>compulsion</u> may certainly be indirect and still constitute a substantial burden, such as the denial of a benefit found in <u>Thomas</u>, "[t]o strike down, without the most critical scrutiny, legislation which imposes only an indirect burden on the exercise of religion . . . would radically restrict the operating latitude of the legislature."  <u>Braunfeld v. Brown</u>, 366 U.S. 599, 606 (1961).

[16] The <u>Tyndale</u> court also considered it a "crucial distinction" that the plaintiff was self-insured as this fact removed one of the "degrees" of separation.  <u>Tyndale</u>, 2012 WL 5817323, at *13.  Here, Conestoga is not self-insured, thus creating further distance between the Women's Preventive Healthcare regulations and the possible use of abortifacients.

hallucinogen.  546 U.S. at 423.  The common thread in these cases is that the government mandate directly impacted the plaintiff's participation in or abstention from a specific religious practice.  That is not the case here.

While compliance with the Women's Preventive Healthcare regulations may impose some burden upon the Hahns, any such burden on their ability to freely exercise their religion would be indirect, unlike the statutes challenged in Yoder, Sherbert, Thomas and Gonzales.  Importantly, Plaintiffs remain free to make their own independent decisions about their use or non-use of different forms of contraception, as that clearly remains a personal matter.  See O'Brien v. U.S. Dept. of Health & Human Svcs., 2012 WL 4481208, at *6 (Women's Preventive Healthcare regulations do not require "that plaintiffs alter their behavior in a manner that will directly and inevitably prevent [them] from acting in accordance with their religious beliefs").

Conestoga's corporate form further separates the Hahns from the requirements of the ACA, as the Women's Preventive Healthcare regulations apply only to Conestoga, a secular corporation without free exercise rights, not the Hahns.  Whatever burden the Hahns may feel from being involved with a for-profit corporation that provides health insurance that could possibly be used to pay for contraceptives, that burden is simply too indirect to be considered substantial under the RFRA.

Finally, we understand, and have carefully considered the fact that the Hahns may be less focused on what Conestoga's employees ultimately decide regarding the use of abortifacients, and more concerned with the burden imposed on their religion by the requirement that they provide insurance coverage that may be used to "pay for, facilitate, or otherwise support abortifacient drugs." (Am. Compl. ¶ 32.)  We respect and fully appreciate this concern, and in no way dispute or denigrate

its legitimacy and its effect as a burden upon the Hahns' religious beliefs.  However, a line must be drawn delineating when the burden on a plaintiff's religious exercise becomes "substantial."  We conclude that, here, that line does not extend to the speculative "conduct of third parties with whom plaintiffs have only a commercial relationship."  Hobby Lobby, No. 12-6294, slip op. at 7 (10th Cir. Dec. 20, 2012).

       3.     The Establishment Clause

The "central purpose of the Establishment Clause [is] the purpose of ensuring governmental neutrality in matters of religion."  Gillette v. United States, 401 U.S. 437, 449 (1971).  Statutes violate this central purpose if they either "prefer one religion over another," Larson v. Valente, 456 U.S. 228, 246 (1982) (quoting Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947)), or create an "excessive government entanglement with religion," Lemon v. Kurtzman, 403 U.S. 602, 613 (1971) (quoting Walz v. Tax Comm'n, 397 U.S. 664, 674 (1970)).

Plaintiffs argue that the "religious employer" exemption does both.  They argue that it discriminates among religions because some organizations qualify for the exemption, while others do not.  Further, they claim that the decision about whether an organization qualifies for the exemption involves excessive entanglement with religion because it requires the government to "explore a religious organization's purpose in impermissible ways."  (Pls.' Br., p. 32.)

Defendants, on the other hand, argue that the Establishment Clause does not prohibit provisions, such as the religious employer exemption, which accommodate religious organizations by excusing their compliance with certain regulations.  They assert that the Establishment Clause only prohibits provisions that discriminate based upon religious denomination, not those that merely distinguish between secular and religious organizations.  Further, Defendants argue that the

exemption does not create excessive government entanglement with religion because the regulation does not call for an analysis of an organization's religious tenets.  They assert that the intrusiveness of the statute is particularly minimal in Plaintiffs' case because Plaintiffs do not meet any of the criteria for the religious exemption.

We agree with Defendants, and with the other courts that have considered the issue, that the religious employer exemption does not violate the Establishment Clause.  See Grote Indus., LLC v. Sebelius, 2012 WL 6725905, at *8-9 (S.D. Ind. Dec. 27, 2012); O'Brien, 2012 WL 4481208, at *9-11.  Although the exemption distinguishes between religious and secular organizations, it applies equally to organizations of every faith, and does not favor any denomination over another.  A statute does not violate the Establishment Clause merely because it distinguishes between secular and religious organizations.  Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 338 (1998) ("Where, as here, government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption comes packaged with benefits to secular entities.").  Indeed, the Supreme Court has repeatedly held that laws, such as the ACA's religious employer exemption, which accommodate religion, have a secular purpose and apply equally to all faiths, do not run afoul of the Establishment Clause.  See id. (exemption for religious organizations from Title VII's prohibition on religious discrimination in employment); see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 132 S.Ct. 694 (2012) (ministerial exception to Title VII's employment discrimination proscriptions); Cutter v. Wilkinson, 544 U.S. 709 (2005) (statute authorizing accommodations for religious practices of institutionalized persons); Walz v. Tax Comm'n, 397 U.S. 664, 666 (1970) (property tax exemption "to religious organizations for religious properties used solely for religious

worship").

Neither does the religious employer exemption create excessive government entanglement with religion.  "The test [for excessive government entanglement] is inescapably one of degree." Walz, at 674.  Some degree of involvement between government and religion is permissible, and perhaps inevitable.  Id.  The court must consider "whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement."  Id. at 675.

The "entanglement" created by the religious employer exemption is minimal.  The regulation requires a one-time assessment based upon minimally invasive criteria.  Specifically, an organization qualifies for an exemption if its purpose is the inculcation of religious values, it primarily employs and serves persons who share the organization's religious beliefs and it qualifies as a non-profit organization under the Internal Revenue Code.  45 C.F.R. § 147.130(a)(1)(iv)(B).  This inquiry is far less invasive than other statutes the Supreme Court has previously upheld.  See, e.g., Bowen v. Kendrick, 487 U.S. 589 (1988) (regular monitoring of religious organizations' use of federal funds did not create excessive entanglement); Agostini v. Felton, 521 U.S. 203 (1997) (unannounced monthly visits to monitor content taught by public employees in religious schools did not constitute excessive entanglement).  As applied specifically to Plaintiffs, the exemption is particularly noninvasive since Conestoga does not even qualify as a non-profit organization.  As such, the government need not examine Plaintiffs' religion at all to determine that they do not qualify for the exemption.

The Supreme Court has consistently recognized that "[t]here is ample room under the Establishment Clause for 'benevolent neutrality which will permit religious exercise to exist without

sponsorship and without interference.'"  Amos, 483 U.S. at 334 (quoting Walz, 397 U.S. at 669).

Where, as here, a statute provides for general religious accommodations while avoiding

discrimination among denominations and excessive government entanglement with religion, it is not

prohibited by the Establishment Clause.

4.      The Free Speech Clause

It is well established that the First Amendment, in addition to protecting the freedom to

speak, prohibits compelled speech.  W. Va. State Bd. of Educ. v. Barnette, 319 US. 624, 642 (1943)

(law requiring recitation of the pledge of allegiance is unconstitutional).  The right to be free from

compelled speech also encompasses the right to refuse to fund speech with which one disagrees.

United States v. United Foods, Inc., 533 U.S. 405, 410 (2001).

Plaintiffs argue that requiring them to purchase insurance that covers "patient education and

counseling for all women with reproductive capacity," which may include advice about

abortifacients, improperly compels them to support speech with which they disagree.  See HRSA

Guidelines, supra.  Defendants offer two responses: (1) the regulation concerns the provision of a

health care plan, which is conduct rather than speech; and (2) the regulation is viewpoint neutral

because it is silent as to the content of the education and counseling, leaving that decision instead

to the patient and her doctor.  Defendants emphasize that Plaintiffs remain free to discourage

employees from using contraceptives which they believe to be immoral.

We agree with Defendants that Plaintiffs' Free Speech claim has little likelihood of success.[17]

---

[17] We also note that, as with Plaintiffs' Establishment Clause claim, every other court to
consider the issue has found that it is unlikely that the regulations violate the right to free speech.
See Grote Indus., LLC v. Sebelius, 2012 WL 6725905, at *9-10 (S.D. Ind. Dec. 27, 2012); Autocam
Corp. v. Sebelius, No. 12-cv-1096, slip op. at 14-15 (W.D. Mich. Dec. 24, 2012); O'Brien, 2012 WL
(continued...)

As the district court observed in Autocam, this claim is materially identical to the one rejected by the Supreme Court in Rumsfeld v. Forum for Academic and Institutional Rights, 547 U.S. 47 (2006). In that case, the Court upheld a statute that conditioned federal funding to law schools upon their agreement to permit military recruiters on campus. The Court reasoned that the statute concerned conduct that was "not inherently expressive . . . because the accommodation [of recruiters on campus] does not sufficiently interfere with any message of the school." Id. at 64. Importantly, the statute neither compelled the law schools to convey their support for the recruiters, nor prohibited them from expressing their disagreement. Id. at 64-65.

A similar analysis applies to the regulation challenged by Plaintiffs. The provision "affects what [Plaintiffs] must do . . . not what they may or may not say." Id. at 60 (emphasis in original). The conduct it requires of Plaintiffs—the purchase of certain health care coverage—is not inherently expressive. Purchasing a healthcare plan does not normally convey agreement with every medical procedure covered by the plan, or every health care decision made by a patient and her doctor. See Texas v. Johnson, 491 U.S. 397, 404 (1989) (conduct is inherently expressive when "[a]n intent to convey a particularized message was present, and . . . the likelihood was great that the message would be understood by those who viewed it." (quoting Spence v. State of Wash., 418 U.S. 405, 410-11 (1974))). Further, the regulations do not interfere with Plaintiffs' expression of their opinions regarding contraceptives. Like the law schools in Rumsfeld, Plaintiffs "remain free under the statute to express whatever views they may have on the [use of contraceptives]." Rumsfeld, 547 U.S. at 60.

---

[17](...continued)
4481208, at *11-13.

33

The regulation challenged by Plaintiffs is further distinguishable from those invalidated in the Supreme Court's compelled-speech cases because it does not advocate any particular viewpoint. See, e.g., Barnette, 319 U.S. at 642; United Foods, 533 U.S. at 411 (the government may not "compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors . . .") (emphasis added).  While the regulations mandate that employers provide coverage for "education and counseling" for women of reproductive capacity, which may include information about the contraceptives which Plaintiffs believe to be immoral, the regulations are silent as to the content of the counseling given to a patient by her doctor.  See HRSA Guidelines, supra.  The script that conversation follows is instead determined by the particular doctor and patient. See O'Brien, 2012 WL 4481208, at *12.  As such, it cannot be said that Plaintiffs are being required to fund the advocacy of a viewpoint with which they disagree.  Plaintiffs' concern that a doctor may, in some instances, provide advice to a patient that differs from the Hahns' religious beliefs is not one protected by the First Amendment.

## IV.   **CONCLUSION**

Plaintiffs have been unable to demonstrate a likelihood of success on the merits of their First Amendment and RFRA claims.  As such, we need not decide whether Plaintiffs have demonstrated a right to relief under the other three preliminary injunction factors.  Because Plaintiffs have not met their burden, Plaintiffs' motion will be denied.

An appropriate Order follows.